JAMES A. FOSTER v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY and FRANK VEST, Appellants.—14 S. W. (2d) 561.

Division Two, March 2, 1929.*

*NOTE:—Opinion filed July 25, 1928. Motion for rehearing overruled December 18, 1928. Motion to transfer to Court en Banc overruled March 2, 1929.

1204

*H. J. Nelson* and *Langworthy, Spencer & Terrell* for appellants.

1206

*Rosenberger, McVey & Freet* and *Lawson & Hale* for respondent.

HIGBEE, C.—On April 2, 1925, plaintiff had a verdict in the Circuit Court of Jackson County at Kansas City, against the defendants, for malicious prosecution, for $15,000 for actual and $5000 for punitive damages, and from a judgment therefor the defendants appealed.

The petition was filed on August 11, 1923. On March 14, 1925 an amended petition in two counts was filed. The first count claimed damages on account of the false arrest and confinement of the plain-

tiff, and the second count claimed damages for malicious prosecution. At the close of all the evidence the plaintiff elected to go to the jury on the second count. Briefly summarized, it is charged in this count that at all times therein mentioned the defendant Frank Vest was a special agent, officer and detective of the defendant railroad company; that on June 14, 1923, at North Kansas City, in Clay County, Missouri, the defendants by themselves, their agents and employees acting within the scope of their employment, *maliciously intending to injure plaintiff and without probable cause therefor, did falsely swear* to and file a complaint before T. C. Stean, a justice of the peace for Gallatin Township in Clay County, Missouri, charging that on June 14, 1923, at said county, plaintiff unlawfully, feloniously and wilfully entered a Chicago, Burlington & Quincy Railroad car, No. 43665, the property of said railroad company, with the intent to take, steal and carry away automobiles and accessories therefrom, against the peace and dignity of the State, and said defendants, their agents, servants and employees, acting as aforesaid, did *maliciously and without probable cause,* procure said justice of the peace to issue a warrant for the arrest of plaintiff on said charge, and said warrant was delivered to the constable of said township for service; that *pursuant to said actions* of the defendants, their agents, etc., plaintiff was thereupon arrested and imprisoned under said warrant for the period of three weeks; that he was taken to said justice of the peace on June 14, 1923, not permitted to procure counsel, but was rushed into a preliminary hearing on said charge, and at said hearing on said day and *upon false and perjured testimony* given by defendants, their agents and employees, plaintiff was by said justice ordered held and committed for trial on said charge in the circuit court of said county; that notwithstanding the order of said justice, defendants by themselves, their agents and employees, *did not believe plaintiff to be guilty of said charge, but knew him to be innocent thereof;* that thereafter, on July 5, 1923, the defendants maliciously and without probable cause, caused to be filed in the Circuit Court of Clay County, Missouri, an information by the prosecuting attorney of said county, charging that the plaintiff, on June 14, 1923, at said county, did unlawfully, feloniously and burglariously break and enter into the above-mentioned car, the property of said railroad company, a corporation, in which car there were then and there goods, wares and merchandise kept and deposited, with intent unlawfully, feloniously and burglariously to take, steal and carry away said merchandise in said car, against the peace and dignity of the State. The plaintiff was tried on said charge in said circuit court on July 5, 1923, and was acquitted by the verdict of the jury and the judgment of the court and finally discharged and said prosecution has terminated.

Plaintiff states that he was not guilty of said charge; that the defendants, their agents and servants, acting at defendants' directions

and within the scope of their employment, wilfully and maliciously caused, instigated and continued the said criminal proceedings against plaintiff without probable cause to believe plaintiff guilty of the charge made with malice on their part; that newspaper accounts of his arrest and incarceration were published in Clay County, Missouri, and in Canadian, Texas, plaintiff's former home; that pursuant to said commitment, plaintiff was confined in a dungeon, mostly underground, with criminals, black men and white men; that said place of confinement was poorly lighted and ventilated, damp and filled with foul odors; that while so confined he was unable to provide for his wife and two infant children, and as a direct result of said acts of the defendants he lost his job as switchman and cannot in the future obtain employment with any railroad, and incurred bills for services in connection with his defense for which he is liable, and that *by reason of all of said acts* of defendants, plaintiff has suffered great bodily and mental pain, humiliation and lasting injury to his health, good name and reputation. The prayer is for $25,000 for actual and $25,000 for punitive damages.

Frank Vest's answer is a general denial.

The amended answer of the railroad company, after generally denying all the allegations of the petition, avers that Frank Vest, at the time of plaintiff's apprehension, held a commission as deputy constable of Gallatin Township, Clay County; that while Frank Vest was watching said car No. 43665, early in the morning of June 14, 1923, he observed plaintiff wrongfully enter said car; that it was sealed; that the entry into said car by switchmen or anyone else was in violation of the rules, instructions and duties of switchmen and was unlawful and sufficient ground to cause him to believe, and he did in good faith believe, that a felony was being committed, and acting in accordance with his duties as deputy constable, said Frank Vest apprehended plaintiff and placed him in charge of the proper authorities; that this defendant was not and is not liable on account thereof.

For further amended answer, this defendant states that Raymond W. Cummins, then Prosecuting Attorney of Clay County, on his own initiative, prepared, swore to and filed the information upon which the prosecution of plaintiff proceeded, and conducted the prosecution; that said prosecution was not instigated or carried on by this defendant, and it is not liable on account of said prosecution.

The reply is a general denial of the new matter in the amended answer of the railroad company. The case went to trial on the issues thus raised, with the result above stated.

There was substantial evidence to support the verdict. The record evidence shows that on June 14, 1923, Frank Vest signed and swore to a complaint before T. C. Stean, a justice of the peace of Gallatin Township, Clay County, charging that Foster unlawfully and feloni-

ously entered the defendant's railroad car with intent to steal automobiles and accessories, the issue of the warrant, plaintiff's arrest, his examination on said charge before said justice and commitment to jail on said day, all as averred in the amended petition; that said cause was set for trial in said circuit court on July 5, 1923; that an information was filed by Raymond W. Cummins, prosecuting attorney, in said circuit court on July 3, 1923, charging that plaintiff, on June 14, 1923, at said county feloniously and burglariously broke into said car with intent to steal, as averred in the amended petition, and that said cause was tried to a jury on July 5, 1923, and a verdict returned finding the defendant not guilty, and judgment entered on said verdict that he "go hence without delay fully acquitted and discharged."

Plaintiff testified in substance: I have lived in Kansas City, Missouri, since January 9, 1923. I have a wife and two children who were two and three years old in June, 1923. I came to Kansas City on January 5, 1923, from Canadian, Texas, where I was married and lived seven years. I worked there for the Santa Fe Railway, first a; a brakeman for two years and then as conductor for four years, until December 21, 1922, when I was discharged on account of a rear-end collision between my train and another train. The rear end of my train was hit by another and both crews were discharged. The Santa Fe gave me a service letter stating the time I had served and the character of my service. When I came to Kansas City I presented this letter to and was employed by the C. B. & Q. Railway Company as an extra switchman, and had worked for it at different places. On the night of June 13, 1923, I was working with a switching crew under foreman Martin at Murray Yards, in North Kansas City, on the rip track job—a crew that handles bad order cars exclusively. The bad order cars are carded "Bad Order." The crew will put them away, according to their class and contents, on the rip tracks.

The first I saw this automobile car was when foreman Martin and I were spotting the bad order cars; that is, placing them four feet apart, so that the car men can get around the car without crawling over the drawbar. We came to this car; there was no carding on it. The card gives information of the contents of the car. I made the cut, and Martin told me at the time there was no carding on the car. I saw there was one door tore off, hanging on the wheel on the north side. This was about 2:30 A. M. We carried lighted lanterns. I was working under his directions. I was ordered by Mr. Siebert, the yardmaster, to work with this crew. Some way in switching, the car had been hit; the sill on the door was splintered for eight inches back, and the door was loose and hanging down on one wheel. When Martin came to the door he got hold of it, pulled it out, and said, Foster, get up there and see if it is a loaded or an empty and tell me what is in it. I got up in the car. I didn't have a chance to do anything.

Special officer Vest stuck a flashlight and a gun in my face. He asked me who was on the outside. I told him it was switch foreman Martin. I got out of the car and held the door open while he got out and he took me to the yard office. Martin asked where I was going; I told him to the yard office. Vest asked the yardmaster who I was; he told him my name was Foster; that I was a switchman there and had been for some time and got along all right. Vest cursed me for a thief and called up the balance of the special officers in Kansas City. Martin came in and told the yardmaster it was a beautiful note a fellow could not do his work without being arrested for it. Mr. Davis, chief special agent for the Burlington, came in. One of the special agents asked me what I was doing. I told him I was working under instructions. They asked me where I came from, who I had been working for. I told them I had been working for the Santa Fe and had been discharged for a rear-end collision. I told them where I lived and where I had worked before coming here. Vest looked up the constable of North Kansas City and put me in jail. They exhibited no warrant. I was taken to Justice Stean about 9:30 A. M., at North Kansas City. I had foreman Martin there. They gave me no chance to get counsel. A bunch of Burlington special agents testified for the prosecution at the preliminary hearing; Vest and Lewis, I didn't know the others' names. I didn't know Vest before my arrest. I questioned Martin to the best of my ability; it wasn't very much. Martin told them I was working on his crew under his directions and that he told me to get in the car to see if it was loaded or an empty, and if it was a load, to let him know the contents. I believe Martin was under oath at the time. Vest stated to the justice he caught me in a box car breaking open boxes and tearing them up; that I had a brakeshoe key with me breaking open boxes and that I had been in the car several minutes. I was in the car just long enough to hop from the ground up there. I wasn't breaking open boxes. I had no brakeshoe key; nothing but my lantern. Lewis and Vest testified for the prosecution at the preliminary; they were both Burlington agents. No one was with Vest at the time of the arrest. After the preliminary I was put back in jail the balance of that day and night. The next morning I was taken to Justice Stean's office and sent to Liberty, Missouri, by Constable Cole to the sheriff and I was put in jail again. It is a room about twelve by fourteen feet, about six or eight feet below the bottom of the ground floor of the court house. There were seven men in there besides myself, some white, some black, all in that room; no windows or ventilation; more of a dungeon; five steel cots about six feet long and eighteen inches wide. The stool overflowed, plumbing fixtures on the bum; overflowed every time it was flushed. The air was foul. I remained in jail about three weeks.

On the day of the trial Raymond Cummins, the prosecutor of Clay County, and, I believe, Mr. Simrall, an attorney employed by the Burlington located at Liberty, appeared to prosecute. Another prosecutor I did not know. The witnesses who testified for the State were all employees of the Burlington. Vest testified. C. H. Siebert, an officer of the Burlington; Ralph W. Davis, chief special agent; John W. Webb, Charles E. Cliff and John A. Fritz are special agents of the Burlington. Mr. Simrall examined witnesses and talked to the jury. The jury was out five or six minutes.

My wife came to see me while I was in jail; wanted to let me know the condition of my child that had been sick with convulsions. I knew she wasn't getting along very well. I had no financial means, only what I was making day by day. Following my discharge I started to look for work. I went to the Union Pacific. I knew the trainmaster. I showed him my Santa Fe service letter and my Burlington service letter. (This letter was produced. It shows service from January 9, 1923, to June 25, 1923. "Dismissed account reprehensible conduct." Stamped: "Burlington Route, C. B. & Q. R. R. Co. Aug. 13, 1923.") I failed to get employment because of my discharge from the Burlington. I tried other companies; same result. I didn't know anything but railroad work. After three months I got other work. The charge against me comes up in conversations; it is brought up in church; the deacons of the church have discussed it; neighbors. The time I worked for the railroad before my arrest I generally made $96 to $100 every two weeks. Since then I have been earning $24 to $35 a week.

Cross-examination: I went to work that night at eleven o'clock. I got into the car between two and three o'clock. During all the time I ever did yard work as a switchman for any railroad I never got into a loaded box car. This is the first time any one ever gave me instructions to get into a loaded box car while doing yard work in the switch yard. I was instructed to get into this car and got into it. I never saw any carding on the car. I didn't look on both sides. I didn't see any merchandise in the car. Coming out from the dark and having a flashlight stuck into my face, I couldn't see. I got my hand on my lantern when there was a flashlight and a gun stuck in my face; hadn't got off my hands and knees yet. After he took the flashlight out of my face I got on my feet. Martin was about thirty feet up the car. I don't know where he was when I got out of the car. It was pitch dark and you could not see ten feet. Martin hollered to me: "Where are you going off the job?" I told him I was going to the yard office. Martin didn't say anything to that. The prosecuting attorney was at the preliminary but he did not conduct the hearing. Vest and Lewis testified. Justice Stean read the warrant to me and they told me I was charged with being a robber.

Re-direct examination: Mr. Moore was the other switchman on the crew that night. I think I had worked two or three nights with Foreman Martin prior to that night. I didn't know the other members of the crew. I don't know where Martin is. After I was arrested, I got into communication with a neighbor of mine and he got me some counsel. I wasn't able to give bond. We wired to Canadian for people that were acquainted with me; that was where I came from. That was the town I told Vest and the other officers about. I incurred about $500 expense in connection with my defense.

Re-cross: I signed a note to my attorneys, I believe for $450. I employed them three or four days after I was taken to Liberty. My attorneys didn't tell me they didn't want me to make a bond.

Rev. T. P. Stafford, minister of the Beaumont Baptist Church in Kansas City, testified that soon after Mr. Foster and his wife came into the community about two years before the trial, they joined his church; that Mr. Foster's general reputation as a law-abiding man was good. Another witness testified to plaintiff's good reputation in that respect, and that he had heard it whispered around among people coming into his store that plaintiff had been arrested. Three prominent residents of Canadian, Texas, testified they knew the general reputation of the plaintiff, while he lived in that town, as a law-abiding citizen and that it was good, and that they had come from Texas at their own expense to attend the trial as witnesses for the plaintiff. The depositions of other witnesses residing in Canadian, Texas, that plaintiff's reputation as a law-abiding man while he lived there was good, were read in evidence.

Harry W. Maxwell, superintendent of terminals of the Burlington railroad, including Murray Yards, testified: The switch foreman is foreman of the crew in the handling of cars. The other men work under his orders. Don J. Martin was switch foreman on June 13, 1923, in charge of Murray Yards. I learned of Foster's arrest. I had Martin in my office on June 15, 1923, and investigated his conduct. I believe he told me that Foster entered the car by his instructions.

Cross-examination: The duties of a switchman or switch foreman do not include entering loaded box cars in the terminals while switching. Cars are handled by card. Prior to June 14, 1923, there had been pilfering and stealing from box cars in the Murray Yards. Since then the amount of pilfering from box cars has diminished.

Re-direct: There is no printed rule that a switchman shall not go into a car. It is an unwritten law of the switchmen ever since I have been railroading. We had in our employ at that time a detective by the name of Vest. Martin was discharged on his admission that he sent Foster into that car.

Ralph W. Davis testified: I was employed by the defendant railroad company in June, 1923, as special agent, and had charge of all

the special agents at Kansas City. Frank Vest was employed by the railroad at that time as a special officer to patrol the yards and protect the property from theft and had authority to arrest all persons found destroying or stealing. I had heard before that time that Vest was an ex-convict.

Cross-examination: I had heard that Vest had been convicted of manslaughter for killing a man who had insulted his wife. I went to this box car on the morning of June 14, 1923. (Witness produced the card which had been on the car showing it was for George Dodson, Hiawatha, Kansas.) On and prior to June 14, 1923, Vest had acted in the capacity of a constable of Gallatin Township, Clay County. He lived in Jackson County. I was present at Foster's trial in Liberty. Frank Vest, C. H. Siebert, Ralph W. Davis, C. S. Middleton, John A. Fritz, John W. Webb and Charles E. Cliff, all employees of the railroad company, were witnesses for the prosecution. Mathews, a special agent for the railroad company, and Davis attended to getting these witnesses to the trial.

James S. Simrall testified: Am an attorney at law at Liberty, and for a number of years have been local attorney for the defendant railroad company. I assisted in the prosecution of the case of State v. James A. Foster at the June term, 1923. The Burlington Railroad Company, I think, paid me a little fee in the matter.

Mrs. James A. Foster, plaintiff's wife, testified: At the time my husband was in jail at Liberty we had two children aged two and four years. I didn't have any money and I had to ask for credit. The baby was seriously ill at that time and had convulsions. While my husband was in jail I visited him and told him how the children and I were doing.

The evidence for the defense, so far as material, is as follows:

Floyd Vincent testified: I was car inspector for the C. B. & Q. on June 13 and 14, 1923, at Murray Yards. C. B. & Q. car No. 43665 was bad ordered by me. I inspected it at noon. The doors was in good condition. It was loaded with automobiles. I noticed that route card on it. I did not see the car after I inspected it.

K. B. Martin testified: I inspected car No. 43665 on June 14, 1923, on the rip track in the Murray Yards between 7:30 and eight A. M. The left side door was partly open. It was cleated on account of the door being partly open. A board one inch by six was nailed on the outside across the door. I didn't find any woodwork about the car or any of the parts broken.

C. H. Siebert testified: I have been general yardmaster for the Burlington seven or eight years for all of Kansas City, and was on June 13 and 14, 1923. Don J. Martin was a switchman for the company. He was relieved for participating in this entering car No. 43665. The ordinary switchman should have no business to enter any loaded car. Yard clerks and special agents are given that au-

thority. Martin had been switch foreman two or three years. He was in charge of the crew and they were expected to obey his orders.

R. D. Smith, traffic manager of the Kansas City branch of the Ford Motor Company (examining defendant's exhibit 12), testified: That is a record for a shipment of automobiles from our branch on June 13, 1923, contained in C. B. & Q. car No. 43665. That is kept under my charge. The inspector inspecting that car made a notation of the fact that the lugs of the car were loose, allowing a door to swing over the top without removing the original seal. According to our records, the car had a loose lug and the door could be rolled over the lug and swing out without removing the seal.

It was agreed that Foster's wages ran from $113.79 to $169.99 per month while employed by the Burlington Railroad Company.

E. M. Mathews testified: I have been employed by the railroad company for nine years; was at the St. Joe office in June, 1923; that office has jurisdiction over the Kansas City offices. Frank Vest was employed as a special officer under me. I investigated his record at the time I employed him. I investigated the homicide and concluded he was justified. He was assigned to investigation of depredations against railroad property and the protection of railroad property in the different yards. In June, 1923, and prior thereto, he had been acting as deputy constable in Gallatin Township. I was present at the trial in Liberty. The prosecuting attorney requested me to procure the attendance of witnesses at that trial. He designated the witnesses he wanted and we arranged to have them present so far as we could. The witnesses were all Burlington employees. A part of the time I sat at the counsel table with Mr. Cummins and Mr. Siebert and the other attorneys for the prosecution. As deputy constable in Gallatin Township he worked only on the C. B. & Q. property. Vest's conviction was in Holt County. I talked to the prosecuting attorney, circuit judge and the sheriff who were serving in 1923. Vest was discharged in October, 1924. He and another special officer were arrested for getting drunk is what I heard.

Thomas G. Lewis testified: I was employed as special officer for the Burlington in June, 1923. I went with Vest and Foster to the justice of the peace in North Kansas City and was there till after the preliminary hearing. The prosecuting attorney was present. He talked to Vest and Foster. Martin was there and testified. He told there before the hearing that he ordered Foster to get into the car and I believe he testified on the hearing that he did. He told me before the hearing, and testified to it at the hearing, that he told Foster to get into the car. Foster told me the same thing.

Frank Vest testified: I live in Holt County. I was employed by the Burlington in July, 1922, as a special watchman; became a special officer in January, 1923, to watch yards here for merchandise and protect property. My jurisdiction included Murray Yards. Lived in

Kansas City in June, 1923; did not live in Clay County before that time. A commission was issued to me as deputy constable for Gallatin Township by Bill Cole, constable of that township. I turned it back to Cole in October, 1924, when I quit the service. There had been lots of pilfering from freight cars prior to June 14, 1923. I was directed to watch freight cars. I first saw this freight car about eight P. M., June 13, 1923. It was sealed and the doors were spiked and in good condition. We were having a number of cars loaded with automobiles and accessories pilfered and I was watching such cars particularly. I next saw the car at about eleven P. M., and again at 1:30 A. M., June 14. It was on repair track 6; the doors were in good condition and sealed. Next saw it at about 2:30 in the same place. I entered the car at that time because the spikes had been pulled and it had been throwed out of the lug. I seen it had been pilfered and I thought possibly there will be some one come back to pilfer it again. It was loaded with automobiles and accessories in the center of the car. There were paper cartons. I waited fifteen or twenty minutes. A party came along and set his lantern in the door for a minute or two, then taken it out; then in a few minutes two parties came back. One of them held the door open and the other one got in the car. He opened two paper cartons there, using a brakeshoe key. This is the brakeshoe key he used. Then he walked around the part of the car. He raised the hood, looked at the motor and threw the reflection of his light on me and of course I had to take him into custody. Some one outside asked if he had found anything and he said not yet. It was Foster. I didn't know him at the time. I asked who was holding the door; he said Martin. I taken him to the yard office. This party outside was gone. He was at the engine, or I presumed it was him. We had walked down to a path. Martin asked Foster where he was going. Foster told him to the yard office. Martin came into the office; he said nothing. Davis came over at 4:20 and we taken Foster to North Kansas City to Constable Cole at the North Kansas City jail. I called the prosecuting attorney up by telephone and told him the facts about the case as I have stated them here. He told me to file complaint on him and that he would write me a letter authorizing me to sign the complaint. He wrote me the letter (here produced.) It is dated June 14, 1923, addressed to Frank Vest and reads: "I have learned that you arrested a man named Foster in a box car in the Murray Yards. I call upon you to sign a complaint before Justice Stean and prosecute this man in the name of the State. This is merely to protect the State in the matter of costs, should he be released at the preliminary hearing." (Signed, Raymond Cummins, prosecuting attorney.) I signed the complaint after the prosecuting attorney arrived in the afternoon. At the time I signed it I honestly believed Foster was guilty of the offense charged in the complaint. Martin and Lewis and myself

testified at the hearing. Foster testified and asked questions at the hearing. Foster was bound over and placed in constable Cole's custody under the warrant and put in the North Kansas City jail. The prosecuting attorney notified me to be present at the trial. I testified at the trial to the same things I have testified to here before the jury.

Cross-examination: I did not go into details before the justice. "Q. Did you testify about using a brakeshoe on these cartons? A. I didn't have to." I just testified to a few of the preliminary facts as they thought was necessary in a preliminary trial. As a rule it wasn't necessary to have all the evidence. Foster had no attorney. I think he told Mr. Stean he didn't want an attorney at that time. Martin testified that he directed Foster to get into the car. I don't think he was under oath. I didn't know Martin or Foster before that time. I did not ask Foster at that time where he lived or where he had lived in years gone by, so I could investigate his record and standing. I don't think my commission as a deputy constable was ever filed at Liberty. It should have been filed in the county clerk's office. It was issued to me at the request of the Burlington. I did not arrest Martin, nor file a complaint against him. I answered all questions put to me at the preliminary hearing by the prosecuting attorney.

Raymond W. Cummins, Prosecuting Attorney of Clay County testified: I live at Liberty and am serving my second term. The first I learned of the occasion of Foster's arrest was when Vest called me in the morning by telephone. He stated he caught Foster breaking into a box car and had taken him into custody; that he found the car open and climbed inside and presently someone came in and tried to break open boxes containing accessories and he arrested him and he wanted to know what to do with him. I told him to hold him and file complaint and that I would come as soon as possible and would send him a letter authorizing him to make a complaint. Later that day I came to North Kansas City. The complaint was filed after I arrived there. Before filing it I inserted the word "feloniously" and the warrant was issued by the justice. I talked to Martin, Lewis and Vest before the complaint was filed. Foster said he wanted the preliminary then and there. He said he didn't need an attorney. I honestly believed Foster was guilty of the crime charged. I conducted the preliminary hearing as prosecuting attorney. Vest, Lewis, Martin and Foster testified. Foster asked Vest and Martin questions. This was part of the hearing before the justice. The hearing was between three and 3:30; didn't take but a few minutes, and Foster said he could make bond and requested to be left at North Kansas City until later in the day; he was brought to Liberty about six or 6:30. The bond was $1000; it was never given. I afterwards filed an information in the circuit court. Foster told me on the 16th or 17th in the sheriff's office, when I had Foster brought out, that

he didn't intend to give bond. He said he would stay in jail and make somebody pay for it. The trial was on July 5. I conducted the trial on behalf of the State. Mr. Simrall and Mr. Coppinger assisted me. They acted under my directions. I requested them to assist me. I requested Mr. Mathews, chief special agent, to attend to procuring the witnesses at the trial and gave him the list of witnesses.

Cross-examination: I began practicing law July 19, 1922. I believed Vest. I knew Vest, Martin and Foster alone knew anything about the case and that Martin under oath said he ordered Foster into the car and that Foster denied he opened any cartons or that he got in the car for any purpose except to comply with an order. I asked Simrall to help me because he was the attorney for the Burlington system. I did not write to Mr. Nelson of St. Joe and ask him to direct Simrall to help me. I think Mr. Mathews talked to him over the phone. I presume he sent the message because Mr. Simrall assisted in the prosecution of the case.

Re-direct: I talked to Martin and Foster before the preliminary. Foster was stubborn and arrogant. Martin denied knowing anything about Foster's climbing into the car, and again he told me about it and said he was mistaken. He went on the stand and said Foster climbed into the car at his order.

Re-cross-examination: (Witness is shown his deposition filed in this case January 3, 1925.) Yes, it seems to be the testimony given by me at that time. (Reading from the deposition.) The substance of the deposition is: ''After talking with Vest over the phone, I told Vest to sign the complaint. I based that advice solely on what he had told me about the circumstances. Don J. Martin was Foster's superior in the crew. Q. Did Martin tell you he had ordered Foster to climb into this car? A. As I remember, Martin didn't say a thing about that until the day of the trial in the circuit court. I remember, as I was surprised at that. I talked to Martin at the preliminary, cross-examined him. He never told me Foster had gone into the car under his (Martin's) orders. I never heard about that till the date of the trial in the circuit court. If he testified to it down there, it escaped my memory. I was bum-fuzzled or shocked when he made the statement. Martin was a witness for the defense in the circuit court. His testimony at the preliminary, as I remember it and what he told me, was that it was a custom for switchmen to get in the car to determine what the contents were.''

My memory is better now about these things than when my deposition was taken. I was mistaken about where and what Martin testified to. I have examined the files and talked it over with people; that was the first time I had heard of it in almost two years. I was confused between the preliminary hearing and the hearing in the circuit court.

In rebuttal Foster testified: I had no conversation with the prosecuting attorney after my arrest in the sheriff's office at Liberty. I did not say I would not give bond and would make someone pay for my imprisonment. I had no conversation with him after the preliminary; the next time I saw him was in the circuit court at Liberty.

Cross-examination: I have no recollection of having any conversation with him before the preliminary. I made no statements to him or in his presence. I did not say I did not want a lawyer. I asked Cummins what a preliminary consisted of; I was ignorant of the law and he told me and I asked Constable Cole. I told him I wanted a lawyer and asked a gentleman in a drug store if he could advise me to get a lawyer and he referred me to a partner, I believe, of Mr. Simrall. I talked to Cummins at the preliminary hearing and at Liberty. I did not talk with him before the beginning of the preliminary hearing. I had Martin at the trial at Liberty, but did not call him as a witness.

Re-direct: The prosecutor did not call Martin as a witness. I had no brakeshoe, nothing but the lantern when I got in the car. I did not touch any of the boxes in the car.

Joseph M. Elgin testified: I was sheriff of Clay County in June and July, 1923. Foster was in the county jail. I don't remember that he was taken out of jail at the request of the prosecuting attorney and taken to my office where the prosecuting attorney talked to him. I don't remember any such thing. Foster did not say in my presence that he didn't want to give bond, or that he would stay in jail and make someone pay for it.

I. The first contention of appellant's learned counsel is that the defendant's demurrers at the close of all the evidence and the peremptory instruction to find for defendants should have been given: (1) For reasons of public policy actions for malicious prosecution are not favored by law; (2) all the evidence in the case, and even the plaintiff's evidence standing alone, showed probable cause for the prosecution, and (3) the evidence shows conclusively that the Prosecuting Attorney of Clay County was the procuring cause of the prosecution.

As to the first proposition, it may be said that the action for malicious prosecution is not favored because "public policy favors the exposure of crime, which a recovery against a prosecutor obviously tends to discourage." [18 R. C. L. 11.] It means no more than this: in an action of this character the prosecutor is not required to prove that the plaintiff was guilty of a crime; the law will not allow him to be mulcted in damages unless the evidence shows there was no probable cause for the prosecution. Malice and want of probable cause must concur in order to constitute malicious prosecution. [Stubbs v. Mulholland, 168 Mo. 47, 67 S. W. 650.]

The second proposition is that all the evidence, even that of the plaintiff standing alone, showed probable cause for the prosecution. The material portions of the evidence have been set out and will be only briefly alluded to here. Plaintiff, while working under his foreman, whose orders he was required to obey, was directed to get into the car to see if it was an empty or was loaded, and if loaded, with what, in order that the foreman, Martin, might properly place the car. It was a dark night, the yard was full of workmen. Foster and Martin carried lanterns which advertised their movements. Vest, who had authority from the Burlington Railroad Company, arrested plaintiff, took him to the yardmaster's office and reported that he had found plaintiff in a loaded box car breaking open boxes and stealing the contents, and cursed him as a thief. Other special agents, Ralph W. Davis and K. B. Martin, who inspected the car soon after plaintiff's arrest did not testify that any package was broken. K. B. Martin testified that the door was partly open and a board nailed across the door. The consignee, who lived at a near-by town in Kansas, was not called nor his testimony taken. Martin told the yardmaster he had ordered Foster into the car and his purpose in doing so and that the charge was a frame-up. The good faith of Martin and Foster were questions of fact for the jury. Vest was known to be an ex-convict. Foster told the yardmaster where he lived and that he had recently come from Canadian, Texas, where he had been employed by railroad companies. Reasonable inquiry would have disclosed that plaintiff's reputation as a law-abiding man where he lived and had lived was good, yet no inquiry was made. Complaint was made before the justice and sworn to by Vest, which, with the information he had he knew or should have known was false in its entirety. Vest did not disclose to Mr. Cummins, the prosecuting attorney, that Martin said at the very time of the arrest that he had ordered Foster into the car, and the information he gave Cummins that he caught Foster, red-handed as counsel say, breaking open boxes and stealing goods, he knew was false. The prosecuting attorney in his deposition testified that although Martin and Foster testified that Martin ordered Foster into the car and the purpose therefor and that no boxes were broken, yet he believed Vest's statement and acted solely on that in instituting and carrying on the prosecution. Foster was not allowed an opportunity to procure counsel but was rushed into a preliminary hearing and on Vest's false and perjured evidence was committed for trial. Being unable to give bond, Foster was lodged in jail. Cummins' testimony that Foster said in the presence of the sheriff that he didn't want to give bond was contradicted by the sheriff. This and other circumstances tended to discredit the testimony of the prosecuting attorney.

Appellants have much to say about the car being broken open and Foster's unlawful entrance in the middle of the night into the car loaded with automobile accessories, contrary to the rules of the company. They ignore the fact that the evidence of their own witness, R. D. Smith, is that the lugs of the car when it was loaded were very loose, allowing a door to swing over the top without removing the seal, and that Foster and Martin were on duty in the nighttime, with lanterns in their hands, and that it was plaintiff's duty to obey his foreman who was preparing to "spot" this car at this very time; a most inopportune time to pilfer when the yard was full of employees. His "not to reason why," but to obey his orders. It is unreasonable that thieves would have proceeded at such a time and under such circumstances.

Thomas G. Lewis, a special officer of the Burlington, went with Vest to the justice; they were at the preliminary hearing; they heard the evidence of Martin on that occasion; they saw Foster, who was ignorant of such proceedings, rushed into the hearing without the assistance of counsel, if indeed they did not participate in the proceeding. The evidence throughout shows the activity of the railroad officials and employees in charge of the prosecution. The legal department, at the request of Mr. Mathews, directed Mr. Simrall to assist in the prosecution and paid him therefor.

It was held in Stubbs v. Mulholland, supra, that the defendant in an action for malicious prosecution is chargeable with having all the knowledge of the facts before the prosecution was instituted which he could have learned by due diligence (syl. 4); that proof of the arrest of a person, recklessly and unreasonably and in gross disregard of his right, is sufficient to show malice, without evidence of ill-will, malevolence or revenge, though evidence of such feeling is admissible (syl. 9), and that where there is evidence of malice or want of probable cause, such issues are for the jury and cannot be taken from them by a peremptory instruction of the court (syl. 20.).

Probable cause for criminal prosecution has been defined as "a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged." [18 R. C. L. 35, citing Stacey v. Emery, 97 U. S. 642. See also Stubbs v. Mulholland, supra, p. 74; Irons v. Express Co. (Mo.), 300 S. W. 283; Carp v. Ins. Co., 203 Mo. 295, 101 S. W. 78; Hanser v. Bieber, 271 Mo. 326, 197 S. W. 68.]

Laying aside the filing of the information by the prosecuting attorney to be presently considered, we think there is clear proof from which the jury could find want of probable cause. The defendants, as has been said, are chargeable with having knowledge of the facts before the prosecution was instituted which they could have learned by due diligence. They knew Martin protested that he had ordered

Foster to enter the car and his reason therefor. The circumstances were inconsistent with an intention to steal. In the face of this information, the prosecution was recklessly instituted and continued without inquiry as to Foster's reputation or as to the truth of Vest's statements.

Where, as here, the charge is based on the statement of one convicted of a felony, common prudence requires that the truth of the statement should be investigated before the person named in it is charged with crime. See Blunk v. A. T. & S. F. Railroad Co., 38 Fed. 311, 313, by Judge BREWER, and 18 Ruling Case Law 36, and cases cited in note 9.

In Stubbs v. Mulholland, 1. c. 77, it is said:

"Did defendants, or either of them, or those acting under them, make such suitable and reasonable inquiries?

"Among such inquiries would be: One as to whether the accused was a person of good character in the community where he had lived; for nearly a year in Springdale, Arkansas, and in Scott County, Missouri, where he had lived for twenty years; . . . and such inquiries were 'ascertainable facts,' having a direct and pertinent bearing on the question of probable cause.

"Whenever the inquiry is, Is there probable cause for the institution of this prosecution? there the character or reputation of the proposed accused is an important factor in determining that point and answering that inquiry; and this is true whether such character, to-wit, reputation, be good or bad. It needs scarcely be said that abundant authorities support this position."

See also Carp v. Ins. Co., 203 Mo. 295, 348; Shea v. Cloquet, 97 Minn. 41; Thurkettle v. Frost (Mich.), 100 N. W. 283, 285; Murphy v. Davids (Cal.), 186 Pac. 143, 148.

Foster had recently delivered to the railroad company his service letter from the Santa Fe Railroad Company, giving his record of seven years' service in Canadian, Texas. Foster told Vest and the railroad officials his address in Kansas City. No one except Vest, Foster and Martin knew the facts about the alleged cause for arrest; they knew Vest was an ex-convict and that he was contradicted by Foster and Martin. Under these circumstances a reasonably cautious and prudent man would have made inquiry as to Foster's character before arresting him on a serious charge. Such inquiry would have shown him to be a man of good character and the improbability of Vest's unfounded charge.

In Walton Trust Co. v. Taylor, 2 Fed. (2d) 342, plaintiff was arrested and prosecuted on a charge of forgery in Bates County, Missouri, and thereafter brought his action for malicious prosecution. The Circuit Court of Appeals, in the course of its opinion, on page 345, said:

"But there was also abundant evidence tending to show that Taylor was, and for many years had been, a resident of Lincoln, Neb.; was in the real estate business there, and bore a good reputation; that he owned property, both there and in Kansas City; that he had a wife and family; that he frequently came to Kansas City, transacted business there, and was well known by real estate men in that city.

"It is a reasonable inference that all this and more would have been readily learned, if W. E. Walton had followed up, instead of abandoning, the inquiry which he started at the Snyderhoff Hotel, or if J. B. Walton had followed up, instead of abandoning, the inquiry which he started at the real estate office of Ennis & Co., or if they had made inquiries at Lincoln, Neb., where, as the evidence shows, they understood Taylor was, a few days prior to his arrest. And from the testimony of witnesses at the trial, giving details of the transaction in which Chas. W. Bean, at Little Rock, had signed the name of W. P. Winn to the check for $500 above mentioned, it might fairly be inferred that, if defendants had pursued their investigations at Little Rock with ordinary care, they would have learned that Chas. W. Bean and N. L. Taylor were two entirely different men. Such facts, if learned, would have tended strongly to show the improbability of defendants' theory that Taylor was the forger of the Winn papers.

"Defendants could not deliberately refrain from trying to learn facts readily ascertainable, and afterward successfully contend that the half facts in their possession were a sufficient basis for probable cause; nor would the imparting of such half facts to an attorney form a sufficient foundation for the defense 'advice of counsel.' "

The third contention under appellants' first point is that the evidence shows conclusively that the prosecuting attorney was the procuring cause of the prosecution.

In Sharpe v. Johnston, 76 Mo. 660, 670, it was said:

"When an indictment has been found by the grand jury or the defendant has been committed by the examining magistrate, this prima-facie evidence of probable cause may be rebutted or overthrown by evidence showing that such indictment, or commitment, was obtained by false or fraudulent testimony, or other improper means, or by evidence showing that the prosecutor, notwithstanding the action of the grand jury, or the committing magistrate, did not himself believe the defendant to be guilty."

To the same effect, see Steppuhn v. Railroad Co., 199 Mo. App. 571, 577, 204 S. W. 579.

We quote from Wilkinson v. McGee, 265 Mo. 574, 586, 178 S. W. 471:

"In the very recent case of Thienes v. Francis, 69 Ore. 165, it was said: 'The finding of an indictment by a grand jury, when shown

as prima-facie evidence of probable cause, may be overcome by proving that the indictment was procured by perjured evidence.' ''

There was ample evidence to warrant the jury in finding that Vest withheld from Mr. Cummins, the prosecuting attorney, all reference to the statement of foreman Martin that he had ordered Foster into the car and that what he did tell Cummins he knew to be false, except the simple fact that he saw Foster in the car. We have also recited the evidence that Cummins testified that in instituting and carrying on the prosecution he believed and relied on Vest's statements to him. In this respect Carp v. Ins. Co., supra, is almost on all-fours with the instant case. It was there insisted that the prosecuting attorney, McPherson, prosecuted the case on his own initiative. We quote from page 350:

''No one will question upon reading this record, the absolute sincerity of the prosecuting attorney, but this insistence of the defendants entirely ignores the fact that McPherson received his impressions and formed his conclusion as to the guilt of the plaintiff from the statements made to him by Musgrove, and other witnesses whom Musgrove secured to testify. He says, 'I assumed the witnesses were telling the truth.' . . . Without specifying all the details of the evidence, it plainly appears that Mr. White assisted in the prosecution of this case from its commencement until the prosecution was dismissed by the prosecuting attorney and that he was paid for his services in this criminal case by the accredited agents and attorneys of the defendants. . . . While it is true that the prosecuting attorney assumed the responsibility of his prosecution, it is also certain that he did not start it until Musgrove had signed and sworn to the affidavit prepared by Mr. White in Mr. White's office in the presence of the prosecuting attorney, and did not do so until after Mr. Musgrove had given him all the information and cited him witnesses who would testify to incriminating circumstances. We think without further elaboration that there was ample evidence tending to show that the prosecuting attorney was moved to bring this prosecution upon representations and the evidence furnished him by Musgrove, and that the defendants availed themselves of that evidence and assisted in the maintaining and carrying on this prosecution through their counsel Mr. White from the very inception of the case until its dismissal. . . . It may be added in this connection that the rule invoked that where the defendants truthfully disclosed all the facts within their knowledge to competent counsel and are advised that there is probable cause for a prosecution, they are not liable, would not have justified the court in this case in taking the case from the jury, because, in this case, it was for the jury to determine whether Musgrove disclosed all the facts to Mr. White and the prosecuting attorney which were within his knowledge, or which were easily ascertainable by him touching the plaintiff's connection

with the fire. [Stubbs v. Mulholland, 168 Mo. 47; Sharpe v. Johnston, 76 Mo. 669.]''

As we have seen, it is quite clear that there was ample evidence for the jury to find that the prosecuting attorney was instigated to institute and carry on the prosecution by Vest's false and perjured complaint and evidence. Special agents of the railroad company sat with counsel for the prosecution and an attorney employed by the railroad company participated in the trial. The court properly overruled the demurrer to the evidence. [Irons v. Am. Ry. Express Co., 300 S. W. 284 (11).]

II. The second point in appellants' brief is that the court erred in admitting, as a part of plaintiff's case in chief, testimony of the character witnesses from Canadian, Texas, in overruling defendants' motion to strike the same from the record and in refusing defendants' requested Instructions N and P.

At the time of his arrest, plaintiff had offered witnesses as to his reputation as a law-abiding man in the neighborhood in which he lived in Kansas City. He followed this by witnesses as to his reputation in Canadian, Texas, where he had lived until he came to Kansas City about the first of January, 1923; in other words, that his reputation as a law-abiding man had been good for more than seven years next before his arrest. The objection to the admission of this evidence was that what his reputation was is incompetent, irrelevant and immaterial. However, at the conclusion of the case, the defendants asked an Instruction N withdrawing the evidence, and Instruction P to the effect that this evidence could not be considered as bearing on the question of probable cause unless such reputation as testified to by the witnesses was shown to have been known to the defendants at the time of the prosecution; in other words, that under the law, the defendants might with impunity recklessly cause plaintiff's arrest and prosecution upon the uncorroborated statement of the ex-convict Vest, and that plaintiff's reputation as a law-abiding man had no bearing on the question of probable cause unless it was shown they had knowledge thereof at the time of the prosecution.

It is true, as claimed by appellants, that plaintiff's reputation until attacked is presumed to be good. They cite Kennedy v. Holladay, 25 Mo. App. 503, 508, where it was said by Judge Thompson:

''. . . and the courts have, consequently, united upon the rule that the plaintiff cannot give evidence of his general character, in these actions (slander, libel and malicious prosecution), unless such character is put in issue by the pleadings, or has been attacked on the cross-examination of his witnesses, or, by direct evidence on the part of the defendant,''

1226

The petition charges that the prosecution was wilful, wanton, malicious and without probable cause and that in consequence of said prosecution plaintiff suffered humiliation and disgrace and great and lasting injury to his good name and reputation. We have seen that this court has held in Stubbs v. Mulholland, and Carp v. Insurance Company, and other cases cited supra, that evidence of plaintiff's previous good reputation was admissible as tending to show want of probable cause for the prosecution. In Black v. Epstein, 221 Mo. 286, 305, 120 S. W. 754, Judge Fox said:

"In civil actions the character of neither party unless assailed can be inquired into if not put in issue in the nature of the proceedings. It is put in issue only in that class of cases, such as libel, slander, malicious prosecution, etc., in which evidence of good character is to be considered in assessing damages." [Citing cases.]

The evidence was therefore admissible for the two purposes and the court properly refused Instructions N and P.

III. The third contention in appellants' brief is that the court erred in giving plaintiff's Instruction 5, because of the failure of the instruction to state that punitive damages could be awarded only in the event of a finding of express malice.

In Ruth v. Transit Co., 98 Mo. App. 1, 18, BLAND, P. J., ruled as contended by learned counsel. But the rule in this State and generally in other jurisdictions is otherwise. In Lampert v. Drug Co., 238 Mo. 409, 419, 141 S. W. 1095, it is said:

"There are two kinds of malice; malice in fact, and malice in law. Legal malice as distinguished from actual malice will justify exemplary damages in this State. . . . The Supreme Court of the United States held in Railroad v. Arms, 91 U. S. 489, that punitive damages could be allowed in actions for torts where the injury is wilful, or is the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them."

See also Carp v. Ins. Co., supra, and McNamara v. Transit Co., 182 Mo. 676, 680, 81 S. W. 880.

Malice may be inferred from lack of probable cause. Vest, in making the arrest and instituting the prosecution, was acting within the scope of his employment. There was ample evidence from which the jury could find that he knew the charge preferred against plaintiff was false. In the circumstances of this case this knowledge was attributable to his principal.

IV. The fourth contention is that the court erred in refusing defendants' Instruction, M, that under no circumstances can the jury allow the plaintiff anything on account of the alleged condition of the jail in which he was confined, as shown by the evidence.

In 18 Ruling Case Law 74, it is said; "It is generally held that the plaintiff may show the condition of the jail in which he was confined and his treatment therein, in aggravation of the damages suffered." On page 73: "If, however, the ill-treatment or harm came from illegal treatment on the part of the authorities in charge of the jail, the defendant is not liable therefor."

In Sutherland on Damages (4 Ed.) sec. 1257, it is said: "The filthy condition of the jail in which the plaintiff was confined or any other discomfort, deprivation or circumstance may be shown to enhance compensatory damages for mental anguish and discomfort; but not wrongful acts done by an officer if they were not authorized by the defendant. The unanticipated acts of the plaintiff's fellow-prisoners are not chargeable to defendant."

In H. S. Leyman Co. v. Short, 283 S. W. 96, 98, the Kentucky Court of Appeals said:

"The evidence as to the jail being lousy and that Short became covered with lice, and that his wife was sick and he was thus detained from going to see his sick wife after he learned that she was very sick, was competent upon the questions of mental suffering. Humiliation and mortification are simply phases of mental anguish. In an action for malicious prosecution, mental pain and suffering is an element of actual damages, and whatever legitimately tends to show the character and extent of such suffering is admissible in evidence. The defendant is responsible for the damages suffered by the plaintiff, which are the direct results of the wrong complained of. The proof that his wife was dangerously ill, and that he was confined in a jail where he could not sleep because of the lice and could not go to see his sick wife, were proper to be considered by the jury on the question of mental anguish. [Perkins v. Ogilvie, 146 S. W. 735, 148 Ky. 309; Ross v. Kohler, 174 S. W. 36, 163 Ky. 583, L. R. A. 1915D, 621; Barnes v. Culver, 232 S. W. 39, 192 Ky. 10; Flam v. Lee, 90 N. W. 70, 116 Iowa, 289, 93 Am. St. 242; Rich v. Rogers, 146 N. E. 246, 250 Mass. 587, 37 A. L. R. 656; Dinsman v. Wilkes, 12 How. 390, 391, 13 L. Ed. 1036.]"

V. The fifth contention is that the petition fails to state a cause of action in that it does not aver that the information filed by the prosecuting attorney was procured by the fraud and perjury of the defendants.

Wilkerson v. McGee, 265 Mo. 574, 577, 178 S. W. 471, was an action for malicious prosecution. The petition alleged in substance that the defendant, maliciously intending to injure the plaintiff in her good name and reputation and without reasonable or probable cause therefor, appeared before the grand jury and made complaint and charged her with having committed a misdemeanor, and that he maliciously, wantonly and without probable

or reasonable cause therefor produced and furnished the names of witnesses who came before the grand jury and that it was upon the testimony so furnished and produced by him, the said Andrew J. McGee, that the grand jury found a true bill of indictment against plaintiff, etc. The indictment was quashed and thereafter suit for malicious prosecution, with the averment in the petition cited above, followed. It was held that the averment that the prosecution was malicious and without probable cause was canceled by the averment that the grand jury returned an indictment. Quoting from page 586:

" 'The finding of an indictment,' says 26 Cyc. 40, 'by the grand jury against an accused person charged with crime, is prima-facie evidence of probable cause in an action for malicious prosecution, but it is not conclusive, and may be rebutted by proof that the indictment was obtained by false or fraudulent testimony, or other improper means.' Indeed, why should this not be so when nine men (at least), standing indifferent between the accused and the prosecutor, upon their oaths and in the line of their solemn duty, say *there is probable cause?* Something in such case beyond the mere averment of a cancelled conclusion of law should be set forth, lest the courts be clogged with the doing of vain things, and the law-abiding man of substance held back from the plain duties of good citizenship through fear of being mulcted in unjust damages, and thereby the peace and order of the community be endangered."

It was accordingly held that the demurrer to the petition was properly sustained. In view of this contention, we have italicized certain averments of the second count of the amended petition. While in some respects it may be inartificially drawn, it clearly charges that the complaint was made, the commitment was ordered by the justice, and the prosecuting attorney was induced to file the information maliciously and without probable cause upon false and perjured evidence given by the defendants, their agents and employees, when in fact they did not believe plaintiff to be guilty of said charge, but knew him to be innocent thereof.

The most that can be said of the amended petition is that it defectively states a good cause of action.

"It does not follow that, because a petition is defective and subject to a general demurrer, it would be insufficient to sustain a verdict. On the contrary, the well-settled rule, both at common law and under our code, is that if a material matter be not expressly averred in the petition, but the same is necessarily implied by what is stated in the context, the defect is cured after verdict, the doctrine resting on the presumption that plaintiff proved at the trial the facts imperfectly alleged, the existence of which was essential to his recovery. [Citing cases.] The defendant did not demur to the petition in this case and every presumption will be indulged that the evidence sup-

plied the defective allegation and showed that the grain and hay and farm utensils were in the barn at the time it was burned." [Thomasson v. Insurance Co., 217 Mo. 485, 497, 116 S. W. 1092. See also Nolan v. Railroad, 250 Mo. 602, 614, 157 S. W. 637; Hardy v. Lewis Automobile Co. (Mo. App.), 297 S. W. 169, 170, and cases cited.]

VI. Finally, it is contended that the verdict is grossly excessive in amount. There is clearly no merit in this contention. [Irons v. Express Co., 300 S. W. 283 (18).]

The judgment is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.