**Donald F. CARR, Appellant,**

v.

**Elwena CARR, Respondent.**

**No. 15350.**

Missouri Court of Appeals,
Southern District,
Division One.

May 19, 1988.

Bruce K. Kirby, Wear, Keeter, Karchmer, Nelms & Kirby, Springfield, for appellant.

William A.R. Dalton, Timothy E. Gammon, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for respondent.

CROW, Chief Judge.

This litigation arose from the alleged wrongful refusal of an ex-wife to release a deed of trust on real estate received by her ex-husband in the dissolution of their marriage.

The 17–year marriage of Donald F. Carr ("Donald") and Elwena Carr ("Elwena") was dissolved by a decree entered April 7, 1978. The decree approved a written "Stipulation and Settlement Agreement" which included a provision that Donald would pay Elwena $70,000 for "all of her interest in all marital property" except bank accounts in her sole name and a list of personal property appended to the agreement. The first $20,000 was payable instanter; the remaining $50,000 was to bear interest at eight per cent per annum and was to be paid in ten annual installments of $5,000 each plus accrued interest, the first install-

ment being due April 10, 1979. The $50,-000 debt was to be evidenced by a promissory note secured by a second deed of trust on certain marital real estate ("the farm") in Marion County, Missouri, that Donald was to receive per the agreement.

To raise the $20,000 due Elwena immediately, Donald borrowed $44,000 from a Palmyra bank. He used $22,000 of that amount to retire an existing loan secured by a deed of trust on the farm, thereby enabling the Palmyra bank loan to be secured by a first deed of trust. Donald paid Elwena the $20,000 due her and executed a $50,000 note to her, securing it by a deed of trust on the farm, subordinate to the Palmyra bank lien. Donald's note to Elwena provided: "Privilege is given of making prepayments of any amount at any time without premium." The deed of trust securing Elwena's note provided: "... if [Donald] ... shall ... pay ... the debt and interest expressed in the said note ... when the same become due and payable ... then this deed shall. be void, and the property hereinbefore conveyed shall be released at the cost of [Donald]...."

In a letter dated April 13, 1978, six days after the decree, Donald's attorney confirmed an agreement with Elwena's attorney whereby Elwena was to receive certain additional items of personal property including a Chrysler automobile (inferably already in her possession). The other items, one of which was a horse, were located on the farm.

On April 15, 1978, Elwena went there and picked up all of the items except the horse. At trial, she explained she was unable to take the horse because she had moved to the Springfield area and she had no horse trailer.

By letter of April 21, 1978, Elwena's attorney sent Donald's attorney the certificate of title to the Chrysler, asking that Donald assign it to Elwena. Elwena's attorney simultaneously sent Elwena the certificate of title to a pickup truck for her to assign to Donald. Elwena promptly executed the assignment on the pickup title and returned it to her attorney.

By letter of May 9, 1978, Elwena's attorney informed Donald's attorney that he had received the assigned title to the pickup; the letter asked whether Donald had assigned the Chrysler title to Elwena. The following day Donald's attorney wrote Elwena's attorney that Donald was causing "problems" regarding the "car and truck titles," and that he (Donald's attorney) had advised Donald "to please get the matter straightened out as quickly as possible without any further undue difficulty." The letter concluded, "I do not know whether he will pay any attention to my advice."

While those events were unfolding, Donald was negotiating with Farmers Home Administration ("FmHA") to obtain a loan to pay the $44,000 note to the Palmyra bank and the $50,000 note to Elwena. Myrl Sternke, a Palmyra attorney, was representing FmHA in that matter. Sternke advised Elwena's attorney of the pending loan and sent Elwena's attorney a "Release of Deed" form for Elwena to sign, releasing the lien of her deed of trust. By letter of June 27, 1978, Elwena's attorney sent the form to her and instructed her to execute it and return it to him.

On June 29, 1978, Donald signed a $94,-000 note to FmHA, payable in annual installments over 40 years and bearing interest at eight per cent per annum. Simultaneously therewith he executed a deed of trust on the farm, securing the note; the deed of trust was recorded the same day. Sternke, however, did not disburse the $94,-000, as Elwena's lien had not yet been released.

Elwena testified at trial that she did not receive her attorney's letter of June 27, 1978 (and the release form) until July 10, 1978, as she had moved from the address to which that correspondence was sent. Upon receiving the letter she wrote her attorney that he could tell Donald she was not signing anything until she had the title to the Chrysler, her horse and saddle, and two dogs (Limey and Duke). Elwena added she did not want to hear anything about a boarding bill for her horse.

On July 12, 1978, Elwena's attorney wrote Sternke, enclosing a copy of Elwena's letter of July 10. Elwena's attorney instructed Sternke: "Get me the title to the car and make arrangements to have the horse and other items in [Elwena's] letter delivered to [her] and we will get this matter concluded."

On July 18, 1978, Donald's attorney wrote Elwena's attorney, confirming that Donald had arranged "re-financing of all of his debts and desires to pay [Elwena] in full." The letter was accompanied by the certificate of title to the Chrysler, assigned to Elwena by Donald. The letter added: "[Elwena] was to receive a horse. There was some contention concerning a bill for keeping the horse that [Donald] was attempting to charge [Elwena]. Upon our advice, [Donald] is now willing to waive any claim that he may have for feed in the keeping of that horse, and [Elwena] is free to have the horse picked up at the Carr property at her earliest possible convenience."

By letter of July 22, 1978, Elwena's attorney advised Donald's attorney that Elwena had been contacted by phone and "has instructed that, since we now have the title to the ... Chrysler, I forward the title to the ... pickup truck to you." The letter added: "[Elwena] advised that she has Deed of Release and will deliver it when she returns to pick up the horse, her two dogs and personal items which [Donald] would not let her have when she previously attempted to get these items. [Elwena] advised that she will accomplish this within the next two weeks."

By letter of July 25, 1978, Donald's attorney sent Donald the certificate of title to the pickup and a copy of the letter of July 22 from Elwena's attorney.

Correspondence presented at trial by Donald indicated that on either July 25 or 26, 1978, Sternke returned the $94,000 to FmHA for the reason that "it doesn't appear that the note made to [Elwena] and the Release Deed has been executed and ready for cancellation and recording."

Elwena testified at trial that on August 4, 1978, she hired a man with a truck and horse trailer, and went from Springfield to Palmyra to get her horse, the two dogs and the money. She carried the "deed of release" with her, unsigned. At the farm she encountered her and Donald's 17–year–old son, Jeffrey (who apparently resided there). According to Elwena, Jeffrey did not want her to come on the farm. Nonetheless, recounted Elwena, she phoned Sternke from the farm, as she had understood from her attorney that "the check was at Sternke's office." Elwena quoted Sternke as saying he did not have a check and did not want to talk about it. Elwena then phoned her attorney who, according to Elwena, said, "[G]et the dogs and the horse and get out of there." Elwena testified the horse was not there and Jeffrey asked her to never ask him what happened to it. Elwena took the two dogs and departed, taking a "round trip" back to Springfield to avoid running into Donald.

Donald's $94,000 note to FmHA and the deed of trust securing it were cancelled November 15, 1978, after he paid FmHA $535.67 interest for the period from June 29 to July 25, 1978, plus abstracting and recording expenses.

Donald did not pay the first installment due on his note to Elwena in April, 1979; consequently, she commenced foreclosure proceedings. To avert foreclosure, Donald borrowed $55,000 from an abstract company on July 5, 1979, and paid Elwena the full amount of her note plus accrued interest. She executed a deed of release the same day, releasing the lien of her deed of trust.

On September 25, 1979, Donald borrowed $98,000 from FmHA at nine per cent interest per annum, payable in annual installments over 40 years and secured by a deed of trust on the farm. He used the proceeds to pay the note to the Palmyra bank and the note to the abstract company.

Donald commenced this action October 16, 1981, by filing a two-count petition against Elwena. Count I averred, inter alia, that on or about June 29, 1978, Donald, through Sternke, tendered to Elwena payment in full of her $50,000 note plus accrued interest, that Elwena indicated on July 10, 1978, that she would refuse to sign

a deed of release, that Sternke returned the $94,000 to FmHA on or about July 26, 1978, that Donald was required to renegotiate a loan with FmHA for more money and at a higher rate of interest in 1979, and that as a result thereof Donald sustained the following damages: (a) the costs associated with arranging the 1979 FmHA loan, (b) the difference in interest between the 1978 FmHA loan and the 1979 FmHA loan, aggregating some $34,315, and (c) the $535.67 interest paid FmHA on the 1978 loan for the period that the funds were in Sternke's hands. Count II pled that Elwena's refusal to provide a deed of release in July, 1978, caused Donald to breach his contract with FmHA "to provide clear title" to the farm which was to secure the $94,000 loan, and this constituted a "tortious interference as to the contract" between Donald and FmHA. Count II sought the same actual damages as Count I, and also prayed for punitive damages of $50,000.

Elwena filed a two-count counterclaim, but we are not concerned with it, as it is not a subject of this appeal.

The case was tried by the court without a jury on March 30, 1987, some five and a half years after it was instituted. Donald, in his testimony, revealed that the horse Elwena planned to pick up on August 4, 1978, had died "of natural causes" around May 1, 1978, and that he had burned the carcass.

The trial court subsequently addressed a letter to counsel for the parties; it stated, in pertinent part:

"This Court finds in favor of [Elwena] on both Counts I and II of [Donald's] petition. The Court agrees with [Elwena's] counsel's analysis that there was no contract that [Elwena] breached. Much has been said about the requirements of Section 443.060 RSMo. That section requires a mortgagee to acknowledge satisfaction of a deed of trust at the time of full satisfaction, request, and tender of cost by mortgagor. [Donald's] counsel, on the other hand, states ... that this section is not applicable to this case. [Donald] claims that [Elwena] breached

her contract by anticipatory repudiation. This Court does not so find. A review of ... the letter of July 22, 1978, to [Donald's] attorney is not couched in conditional terms. It simply states that [Elwena] intended to deliver the deed of release at the same time that she was going to pick up her horse, two dogs, and personal items. There is no indication that was a condition to the delivery of the deed of release. [Donald] obviously had not fulfilled all his part of the bargain. The Chrysler automobile title was not sent to [Elwena] until July 18, 1978.... [A] letter from [Donald's] attorney to [Elwena's] attorney, also indicates that '[Donald] is now willing to waive any claim that he may have for feed in keeping of that horse, and [Elwena] is free to have the horse picked up at the Carr property at her earliest possible convenience.' In his testimony in Court, however, [Donald] indicated that the horse died in May, 1978. It would seem that [Elwena] has been led a merry chase."

In addition to the above conclusions, the trial court found against Elwena and in favor of Donald on both counts of Elwena's counterclaim. Judgment was accordingly entered. Donald appeals from that portion of the judgment denying him relief against Elwena. Elwena did not appeal.

Donald relies on two points, the first of which is:

"The trial court erred in its judgment in favor of [Elwena] and against [Donald] in that such judgment is based upon a finding that [Donald] is limited in his recovery by section 443.180, R.S.MO., and such constitutes an erroneous declaration of the law, and an erroneous application of the law to the facts, in that the Missouri Supreme Court has recognized that a cause of action exists in favor of a mortgagor and against a mortgagee for damages by anticipatory repudiation by the mortgagee of its obligation to release or reconvey."

We begin our analysis of this point by observing that Donald's reference to § 443.180 is apparently a typographical er-

ror.[1] The trial court, in the segment of its letter quoted *supra,* referred to § 443.060. No other statute is cited in the letter.

The argument portion of Donald's brief does not mention § 443.180. It does purport to quote a statute identified as "Section 443.130, R.S.Mo., 1939," but there was no § 443.130 in RSMo 1939. There was, however, a § 443.130 in RSMo 1978, which was in effect at the time Elwena allegedly refused to provide the deed of release. Section 443.130, RSMo 1978, provided:

> "If any such person, thus receiving satisfaction, do not, within thirty days after request and tender of costs, acknowledge satisfaction on the margin of the record, or deliver to the person making satisfaction a sufficient deed of release, he shall forfeit to the party aggrieved ten percent upon the amount of the mortgage or deed of trust money, absolutely, and any other damages he may be able to prove he has sustained, to be recovered in any court of competent jurisdiction."

We believe § 443.130, RSMo 1978 (above), is the statute Donald meant to identify in his first point. We deduce that from the following argument in his brief:

> "[Donald] submits that even if Section 443.130 ... could have properly been considered by the trial court, the trial court erroneously declared the law and erroneously applied the law to the facts, in that there is a cause of action, separate and apart from Section 443.130, available to any mortgagor when a mortgagee anticipatorily repudiates its duty to release the mortgage or deed of trust."

We glean from that pronouncement that Donald is saying he had a claim against Elwena under the common law of Missouri, but that the trial court did not think so and consequently denied relief because of a supposed noncompliance by Donald with § 443.130, RSMo 1978.[2]

It does not appear to us that the trial court rendered its decision on such reasoning. The excerpt from the trial court's letter, set forth earlier, states that Donald contended Elwena breached her contract by "anticipatory repudiation." The trial court rejected that theory, finding that the letter of July 22, 1978, from Elwena's attorney to Donald's attorney did not condition Elwena's furnishing of the deed of release on the surrender to her of the horse, dogs, and other property, but indicated merely that Elwena would deliver the release when she came to get those items. It thus seems clear that the trial court considered, and denied, the theory of recovery set forth in Donald's first point. We shall therefore determine, on the record before us, whether the trial court correctly did so.

Donald cites one Missouri case in support of his first point, *Ewing v. Miller,* 335 S.W.2d 154 (Mo.1960), and he cites it as support for the proposition that Missouri appellate courts recognize the existence of a cause of action for damages for anticipatory breach of an agreement to release or reconvey. In *Ewing,* the plaintiffs gave the defendant a warranty deed to an apartment building, and the parties agreed that if the plaintiffs, within a certain time, paid the defendant certain amounts, the defendant would "deed back" the property. The plaintiffs ultimately sued, claiming the de-

---

1. Section 443.180, RSMo 1978, in effect at the time of the events in question, provided:
   > "Nothing contained in sections 443.160 and 443.170 shall be so construed as to make any executor or administrator liable to his decedent's estate for any indebtedness by mortgage or deed of trust, released by him in accordance with this chapter."
   It was carried forward unchanged in RSMo 1986.

2. The supposed noncompliance, as we comprehend Donald's brief, is that Donald's "tender" of the $50,000 plus accrued interest to Elwena while the 1978 FmHA loan was pending was not

"ongoing for 30 days." This assumes § 443.130, RSMo 1978, imposed such a requirement. That statute, however, appears to apply when a mortgagee has *received satisfaction* and has not, within 30 days *after a request to release his lien* (accompanied by tender of costs), acknowledged satisfaction of record or delivered to the mortgagor a sufficient deed of release. It is thus debatable whether the statute was applicable in the instant case where Elwena did not receive satisfaction until 1979. We need not, however, deliberate about that, as it is clear from Donald's brief that he does not claim any right to recover from Elwena under that statute.

fendant repudiated the agreement and that the repudiation constituted an anticipatory breach. Affirming the trial court's direction of a verdict for the defendant, the Supreme Court said:

"If we consider the deed as a mortgage, along with the agreement to reconvey upon performance by plaintiffs of stated conditions, it is clear that a breach in the nature of a repudiation by defendant must be proven to support this suit for damages.... [The] cases establish, generally, the principle that where one party to a contract repudiates it and manifests an intention not to perform, the duty of the other party is terminated. We fail to find here any substantial evidence to show a repudiation by the defendant, or showing that he manifested an intention not to perform the contract.... Missouri has recognized the doctrine of anticipatory breach by repudiation. But such a repudiation is shown only by the disclosure of a positive intention not to perform the contract, by express statements or otherwise....

We also hold that there was no repudiation or breach by refusal to accept a tender, for there never was any effective tender here. Plaintiff had merely conducted some oral negotiations for a sale, and thought he might make a sale; he showed no ability at any time to make repayment.... Tender comprehends not only the readiness and willingness to pay, but the ability to do so. Actually, plaintiff did little more here than to express a hope and possibility of future repayment. An outright repudiation might have obviated the necessity for a tender. There was no repudiation and a tender was necessary; none was made."
*Id.* at 158 (citations omitted).

Explaining the doctrine of anticipatory breach by repudiation, one noted commentator has said:

"Where the injured party to a bilateral contract has not fully performed and there has been no actual violation of promise by the other party, yet by words or by equivalent acts there is a clear repudiation of his contractual obligation, the 'rule' has been thus stated:

'The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of non-performance; but in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it.

'On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.' " 11 S. Williston, A Treatise on the Law of Contracts § 1301 (3d ed. 1968) (footnotes omitted).

Donald, as we understand him, maintains that the deed of trust securing Elwena's note imposed on her a contractual duty to supply him a deed releasing the deed of trust upon tender to her of the full amount due on the note. This is manifested by his second point, which states:

"... the trial court erred ... in that [its] judgment is based upon the finding that [Elwena] did not condition her delivery of a deed of release; and ... such judgment is not supported by substantial evidence, in that all evidence demonstrated that [Elwena] did condition the execution of a deed of release upon the receipt of personal property to which she was not entitled by any prior agreement; did condition her execution of a deed of release to certain items of performance by [Donald] concerning a contract which was divisible and severable from [Elwe-

na's] duty to release the ... deed of trust, and such conditions to be performed by [Donald] as required by [Elwena] constituted conditions in addition to tender of the satisfaction of the debt evidenced by the promissory note ... when, the note and deed of trust were separate and severable contracts from the separation agreement and such requirements by [Elwena] as stated in her letter of July 10, 1978 ... constituted an anticipatory repudiation of [Elwena's] agreement in the deed of trust ... to release the same."

Donald emphasizes that Elwena announced in her letter of July 10, 1978, to her attorney that she was not signing anything until she had the title to the Chrysler, her horse and saddle, and the two dogs. Donald, as we understand him, maintains that Elwena had no right to insist that he assign and deliver to her the certificate of title to the Chrysler and that he surrender possession of the horse and saddle as conditions precedent to her furnishing him a release of the deed of trust. Her statement that she would not sign anything until he met those conditions, says Donald, constituted a repudiation of her contractual duty to furnish the release.

Furthermore, Donald reminds us that neither the written separation agreement nor the supplemental agreement six days after the dissolution gave Elwena any claim to the two dogs. Donald argues, "[Elwena's] new and additional condition that she receive the family dogs, though such had never been agreed to at any time, represented an anticipatory repudiation of the contract."

Assuming, without deciding, that Donald is correct in asserting that Elwena repudiated her obligation to supply a deed of release by insisting that he meet the requirements in her letter of July 10, 1978, before she would sign anything, we nonetheless fail to see how that entitles Donald to relief in the circumstances here.

It must be remembered that Donald's attorney, by letter of July 18, 1978, (a) sent Elwena's attorney the certificate of title to the Chrysler, assigned to Elwena by Don-

ald, (b) informed Elwena's attorney that Donald was waiving any claim for keeping Elwena's horse, and (c) stated Elwena was free to pick up the horse at her convenience. We are mindful, of course, that at the time this letter was written the horse was already dead, but nothing in the record suggests that Elwena knew that prior to August 4, 1978, when she arrived at the farm with the horse trailer. It is thus evident that as of July 18, 1978 (while the proceeds of the 1978 FmHA loan were still in Sternke's hands) two of the conditions imposed by Elwena's letter of July 10, 1978, had—so far as she was aware—been met: (1) assignment and delivery of the Chrysler title, and (2) permission to pick up the horse free of a claim for boarding it. While the saddle was unmentioned in the July 18 letter, Donald conceded at trial, "[A]s far as I'm concerned she could have had the saddle."

By July 22, 1978, Elwena's remaining condition—the dogs—had been met. On that date, as we have seen, Elwena's attorney sent Donald's attorney a letter reporting that Elwena had the deed of release and would deliver it when she came to pick up the horse and the dogs. It is apparent from that letter that Elwena's attorney had advised Elwena by phone that she could have the dogs, and Elwena confirmed this in her testimony at trial. It is also clear that as of July 22, 1978, the proceeds of the 1978 FmHA loan remained in Sternke's hands.

Thus, from what Elwena knew on July 22, 1978, all her requirements for supplying the deed of release had been fulfilled, and her attorney, in the July 22 letter, assured Donald's attorney that Elwena would deliver the deed of release within the next two weeks.

Donald's attorney sent Donald a copy of the July 22 letter; consequently, Donald knew Elwena expected to get the horse and the dogs when she came to Palmyra with the release. Donald testified at trial that when he received the copy of the July 22 letter he phoned his attorney that the horse was dead and that Elwena was not entitled to the dogs. Nothing in the record, how-

ever, indicates that this was communicated to Elwena, and she testified at trial that when she went to Palmyra on August 4, 1978, carrying the deed of release, she expected to get the horse, the dogs, and her money, and she intended to sign the release.

■ The significance of all this is found in the principle of contract law that an anticipatory breach is nullified as the basis of an action for damages if the repudiation of the contract is withdrawn before the injured party brings his action or otherwise materially changes his position, and a repudiation may be retracted by the repudiator prior to the time for performance or prior to a detrimental change of position by the other party in reliance on the repudiation. 17A C.J.S. *Contracts* § 472(2)e., p. 667 (1963). *See also:* Restatement (Second) of Contracts § 256 (1981), and *Williston, supra,* § 1335.

Even though Elwena was proclaiming, from and after July 22, 1978, that she intended to deliver the deed of release, neither Donald nor his attorney notified Sternke that a deed of release was forthcoming from Elwena and that he should hold the funds instead of returning them to FmHA. Sternke, testifying by deposition, disclosed that in handling loans for FmHA, on occasions when a release was not obtained by the expected date he would inform FmHA and receive approval to delay the disbursal of funds. Asked whether he would have kept the funds had he received a letter confirming that Elwena's deed of release "was on its way," Sternke replied, "With the approval of [FmHA], yes."

It may be that Donald, having told his attorney that Elwena was not entitled to the dogs, and knowing that the horse was dead, assumed Elwena would refuse to sign the release even if tendered the amount due on the note, and that this assumption by Donald accounts for his and his attorney's failure to ask Sternke to keep the funds. Whether, however, Elwena, upon learning that the horse was dead and that she could not have the dogs, would have refused to sign the release if the amount due on her note had been ten-

dered on August 4, 1978, is consigned to speculation. At trial, Elwena was asked on cross-examination whether she would have signed the deed of release if she had not gotten the dogs on August 4. Her attorney's objection to the question was sustained, and Donald's attorney withdrew the question.

■ Three crucial facts are nonetheless indisputably established by the record. First, there was never (until July 5, 1979) a tender to Elwena of the sum due her after she had stated—through her attorney—on July 22, 1978, that she would supply the deed of release when she arrived in Palmyra to pick up the horse and dogs. Second, upon tender to Elwena of the full amount due on July 5, 1979, she executed and delivered a deed of release despite having never received the horse (and inferably having never received the saddle). Third, Donald did not sue Elwena when she (according to him) repudiated her obligation to supply the deed of release by the demands in her letter of July 10, 1978. Instead, he waited for more than two years *after* Elwena had performed that obligation before filing suit.

Our review of this judge-tried case is governed by *Murphy v. Carron,* 536 S.W. 2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1].

The trial court, as noted earlier, held that Donald had no cause of action against Elwena for anticipatory breach by repudiation, the theory upon which Donald relies on appeal. The evidence we have recounted is more than ample to support a finding that even if Elwena, by her letter of July 10, 1978, did repudiate her duty to deliver a deed of release (a question we need not resolve), her repudiation was withdrawn no later than July 22, 1978, at a time when Donald had neither filed suit nor detrimentally changed his position, and at a time when the amount due Elwena could still have been tendered to her from the funds in Sternke's hands. That being so, whatev-

er claim, if any, Donald may have had by reason of Elwena's letter of July 10, 1978, evaporated after July 22, 1978. It follows that neither of Donald's two points affords any basis for reversal.

Judgment affirmed.

GREENE, P.J., and HOLSTEIN, J., concur.

