**Jim O'CONNOR and John O'Connor, Plaintiffs–Appellants,**

v.

**Floyd SHELMAN, Nelle Shelman, Kenneth Mort, and First National Bank of Gallatin, Defendants–Respondents.**

**No. WD 40636.**

Missouri Court of Appeals, Western District.

April 25, 1989.

---

John F. Burns, St. Joseph, for appellant.

Harold L. Miller and Martin Day Miller (argued), Maysville, for respondent Shelman.

John Manring and G. Brent Powers (argued), St. Joseph, for respondent Mort.

Robert B. Miner (argued) and Michael L. Taylor, St. Joseph, for respondent First Nat. Bank of Gallatin.

Before NUGENT, P.J., and CLARK and LOWENSTEIN, JJ.

NUGENT, Judge.

Plaintiffs Jim O'Connor and John O'Connor appeal from the trial court's order directing a verdict in favor of defendants Floyd Shelman, Nelle Shelman, Kenneth Mort, and the First National Bank of Gallatin. The order defeated the plaintiffs' claim for tortious interference with a business expectancy. We affirm the trial court's decision.

The plaintiffs assert on appeal that sufficient evidence supported their claim against each of the defendants. A court may direct a verdict against the plaintiffs only if, after considering the evidence in the light most favorable to the plaintiffs and giving them the benefit of all of the reasonable inferences from those facts, reasonable minds could not differ that no cause of action exists. *Lake v. Farm Bureau Mutual Insurance Co. of Missouri*, 624 S.W.2d 28, 29 (Mo.App.1981). To avoid the directed verdict, however, the plaintiffs must present substantial evidence to support each element of their cause of action. *Francisco v. The Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo.App.1981).

This controversy arose because three buyers wanted the same piece of property, a house and a 93 acre tract of land in DeKalb County (The Gray Farm). Two of the buyers could afford it and one could not. Two real estate agencies each wanted the commission from the sale. Defendant Shelman represented one buyer who could not afford it and one who could. The plaintiffs also represented a buyer with adequate means. The buyer with the least means got the first contract. Defendants Shelman and Mort got the commission.

The sellers, Charles and Wilma Gray, placed the acreage on the market as an open listing.[1] Floyd Shelman, a real estate

---

1. Testimony at trial described an open listing as one in which the sellers agree to pay a commis-

broker in Cameron showed the property to Wesley and Paula Strange. The Stranges decided to pay the Grays' $125,000 asking price. The purchase contract called for the Stranges to finance the purchase by assuming a $105,000 note on the property, paying $1,000 down, giving the seller a note for $5,000, and securing a loan for the remaining $14,000. The contract provided that it would become null and void unless the Stranges obtained financing within fifteen days of its March 17, 1983, execution date.

The O'Connors represented Jack Cowen, who also showed an interest in the Gray farm. The plaintiffs, after trying for several days finally contacted the Grays, and told them that they had an interested buyer. Mr. Gray told the O'Connors that the property was subject to an existing sales contract and that the buyers had until April 1 to perform. The O'Connors prepared a "backup" contract for the Cowens and Grays calling for a sale price of $135,000. The parties would close the purchase only if the buyers produced a written cancellation of the prior contract. The Grays signed and returned the contract on March 25, 1983.

The Stranges, pursuant to the first sales contract, attempted to obtain financing for their down payment from the First National Bank of Gallatin. The loan officer believed that Mr. and Mrs. Strange had offered insufficient collateral for the loan, and suggested that they should attempt to obtain co-signers before the bank would lend them the money. The Stranges eventually decided to give up on the loan. Thinking that the deal was off, they picked up their earnest money check from Mr. Shelman's office and returned the key to the farmhouse. They did not, however, execute any document cancelling the contract.

In the meantime, a third buyer, Roy Worrell, pursued his own plan to purchase the farm. He lived next to the Grays before they moved from the farm in January of 1983. Initially, believing their asking price

was too high, he had turned down their offer to sell him the farm. In late February, however, he decided to buy the farm. He asked defendant Kenneth Mort to contact the Grays. Mr. Mort worked as a vice president of the defendant bank, but he also held a real estate license. He tried, but never reached the Grays.

In late March, Mr. Worrell's son, Dick Worrell, finally contacted the Grays about buying the farm. He learned at that time that the Grays had two sales contracts pending. Roy Worrell then asked Mr. Mort if he knew who had the purchase contract on the Gray farm. Because the Stranges had sought their financing through the bank, Mr. Mort knew that they held the contract. Mr. Worrell told Mr. Mort he would pay the Stranges $500 for an assignment of their contract. Mr. Mort contacted the Stranges and Mr. Shelman. The Stranges agreed, and Mr. Shelman dictated the terms of the assignment to Mr. Mort.

On March 29, 1983, the Stranges executed the assignment. Later that day, Mr. Shelman suggested that the Stranges execute a contract to sell the farm to Mr. Worrell. Mr. Worrell and the Stranges agreed to that arrangement, and Mr. Mort, at Mr. Shelman's direction, prepared a sales contract. The Strange–Worrell sales contract then provided the collateral for the loan necessary to consummate the Gray–Strange sale. The bank issued a $20,000 loan to the Stranges, documented by a note dated March 29, 1983.

The O'Connors learned of the assignment on that day, after Mr. Shelman called them to obtain the abstract for the property. Jim O'Connor delivered the abstract and obtained a copy of the Gray–Strange sales contract. That contract indicated that it would expire unless the Stranges obtained financing by April 1, 1983. On April 1, the O'Connors visited the bank to determine whether the Stranges had secured a loan. Mr. Mort informed them that they had requested confidential information and he could not release it.

sion to a real estate agent who secures a buyer, but they reserve the right to find their own

buyer or secure a buyer through another agent.

On April 8, 1983, two sales transactions occurred in Mr. Mort's office. The Grays completed their sale of the farm and executed a deed to the Stranges, who in turn sold the farm to the Worrells, executing a deed in their favor. Mr. Shelman received a $5,000 commission on the Gray–Strange transaction. He paid Mr. Mort $1,250 of that commission for his efforts. None of the parties paid any commission on the Strange–Worrell transaction.

The Cowens, with the O'Connors' assistance, eventually purchased a different farm. For their part in that transaction, the O'Connors received a $16,000 commission. Mr. Cowen testified that he would have preferred to purchase the Gray farm. Mr. O'Connor testified that he had other buyers interested in the property that the Cowens eventually purchased.

The plaintiff O'Connors sued the Shelmans, Mr. Mort and the First National Bank of Gallatin, alleging that the defendants had conspired to deprive the plaintiffs of their expected $10,000 commission from the sale of the Gray farm to the Cowens. After three days of testimony, the defendants all moved for directed verdicts. From the trial court's order granting those motions, the plaintiffs now appeal.

■ To establish a submissible case for tortious interference with a business expectancy, the plaintiff must submit substantial evidence to support each of the following elements: (1) the existence of a valid business expectancy; (2) the defendant's knowledge of the plaintiff's business expectancy; (3) intentional interference with that expectancy that induces its breach; (4) absence of justification; and (5) damages. *See Briner Electric Co. v. Sachs Electric Co.*, 680 S.W.2d 737, 740 (Mo.App.1984). Here, the plaintiffs' cause of action must ultimately fail because they have failed to establish that the defendants acted without justification when they acted to complete the Gray–Strange real estate transaction.

■ The plaintiff must prove absence of justification as an essential element in a claim for tortious interference. *Pillow v.*

*General American Life Insurance Co.*, 564 S.W.2d 276, 280 (Mo.App.1978) (insurance company acted with justification when it informed plaintiff's patients that it would not reimburse fees for particular chiropractic services). One may act in a manner that interferes with another's business expectancy if by so doing one is acting to protect one's own economic interests. *Id.* at 282.

■ The O'Connors held only a contingent business expectancy. Their opportunity to earn a commission on the Gray–Cowen purchase contract would only arise if the prior Gray–Strange purchase contract expired. Defendant Shelman justifiably expected a commission if the Grays and Stranges performed their contract. His actions in accommodating the transaction that transferred the Stranges' rights to the Worrells protected his economic interest in closing the Gray–Strange contract.

Clearly, by acting to secure the performance of the Gray–Strange contract, Mr. Shelman denied the O'Connors the opportunity to earn a commission. He did so, however, by protecting his own pre-existing interest in securing a commission. By placing their property for sale as an "open listing" the Grays invited competition for the sales commission. Mr. Shelman won that competition by securing the first sales contract on the property and seeing that the transaction called for in that contract was completed. "[C]ompetitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relationship." *Briner Electric Co. v. Sachs Electric Co., supra,* 680 S.W.2d at 741.

The plaintiffs argue, however, that Mr. Strange had repudiated the contract by retrieving his deposit check and returning the key to the Gray's house. The sales contract, however, gave the Stranges until April 1 to perform their obligation to secure financing. Although Mr. Strange testified that he believed that the deal was over, he never communicated that belief to

the Grays or to Mr. Shelman. The plaintiffs' own contract, by conditioning closing on the receipt of a written cancellation of the prior contract, recognized the need for some formal notice that the Stranges would not perform. Furthermore, the Grays took no action to change their position in reliance on Mr. Strange's act. Therefore, even if the Stranges did repudiate the contract, the Gray's failure to act upon the repudiation allowed the Stranges to perform within the time provided in the contract. *See Carr v. Carr,* 751 S.W.2d 781, 788 (Mo.App.1988) (absent reliance by the obligee, obligor may retract repudiation and tender timely performance).

By securing a loan and accepting the deed, the Stranges performed their contract with the Grays. Mr. Shelman and Mr. Mort acted to help the Stranges complete that transaction. Because the defendants acted to secure the performance of a pre-existing contract, the plaintiffs have failed to show that the defendants' actions lacked justification. Therefore, the O'Connors failed to establish a cause of action for tortious interference with a business expectancy.

The plaintiffs premised the defendant bank's liability on Mr. Mort's actions. The plaintiffs failed to prove a right to recover from Mr. Mort for his conduct, they also failed to make a case against his employer, the First National Bank of Gallatin. *See Burnett v. Griffith,* 739 S.W.2d 712 (Mo. 1987) (en banc).

Accordingly, we affirm the trial court's order directing a verdict for each of the defendants.

All concur.