ANNBAR ASSOCIATES, a partnership, Respondents,

v.

AMERICAN EXPRESS COMPANY and American Express Reservations, Inc., Appellants.

No. KCD 28792.

Missouri Court of Appeals, Kansas City District.

April 3, 1978.

Rehearing Denied May 1, 1978.

Dick H. Woods, George E. Feldmiller, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for appellants.

David Skeer, David W. Howard, Kansas City, for respondents.

Before WELBORN, Special Judge Presiding, PRITCHARD, J., and HIGGINS, Special Judge.

ROBERT R. WELBORN, Special Judge Presiding.

Action for damages by hotel owners against operators of reservations service for misrepresentation as to the availability of rooms at plaintiffs' hotel. Upon trial to jury, verdict was for plaintiffs for $25,000 actual damages and for punitive damages

of $100,000 against each of the two defendants. Defendants have appealed.

Annbar Associates is a partnership whose members were Mrs. Ann Goldstein and Mrs. Barbara Goldsmith. From 1962 to 1974 the partnership owned the Muehlebach Hotel in Kansas City. Alfred Goldstein, a resident of New York and husband of Ann, managed the partnership affairs. Day to day operation of the hotel was in the hands of a resident manager, Ralph Hitz, Jr., from 1971 through 1973. An assistant manager, Ken Vincent, was in charge of the Muehlebach's reservations department.

American Express Company is a corporation engaged in various activities, including a credit card business. American Express Reservations, Inc., is a wholly owned subsidiary of American Express. It provided a computerized reservation system for member hotels and motels, involving the employment of a telephone reservations service for use by members of the public by means of a toll-free call in making reservations for accommodations at member hotels and motels.

Prior to 1972, the Muehlebach had not honored national credit cards. Mr. Goldstein did not favor their use by the hotel, although Mr. Hitz and Mr. Vincent believed that the hotel should honor them and on several occasions they made such recommendation to Mr. Goldstein. In 1972, Goldstein acceded to Hitz's "pestering" and authorized Hitz to contract for acceptance of American Express credit cards and membership in Reservations Space Bank system.

On May 9, 1972, the Muehlebach entered into separate agreements with American Express and Reservations. The agreement with the former called for the hotel to permit holders of American Express credit cards to charge purchases at the hotel by use of that card. Such charges were to be sold to American Express at a 3½% discount.

The agreement with Reservations set both the terms and conditions of the hotel's membership and use of the Reservations system. Reservations was to be paid a $50 monthly fee plus 5% of the rental for accommodations reserved through the system, subject to a minimum charge of $1.50 for each rental unit.

The Muehlebach began operating under the agreements. In January, 1973, Goldstein, upon reviewing the hotel's monthly operating statement for December, 1972, directed Hitz to cancel both agreements because they were costing too much. Hitz unsuccessfully tried to talk Goldstein out of the action. Hitz then notified the American Express Regional Hotel Sales Manager that the agreements were being cancelled. A written notice to that effect was made by Hitz on February 1, 1973.

The Muehlebach immediately began refusing to accept American Express credit cards. However, Muehlebach reservations personnel were not told of cancellation of the reservations agreement and they continued to receive and accept reservations under the system. The hotel, which experienced a serious "cash crunch" from February to September, 1973, paid none of Reservations' monthly invoices from February to June 8, 1973. As of April 30, 1973, $699.99 was owed on the account. The agreement between Reservations and Muehlebach called for payment of invoices within ten days of receipt. On May 30, 1973, Reservations notified the Muehlebach that because of its delinquency, its Space Bank service had been terminated, effective May 21, 1973. On June 8 and 13, Muehlebach paid the $699.99 owed as of April 30. Charges continued to be made on the basis of reservations made before May 8. As of August 31, 1973, Muehlebach owed $141.73 on the account.

In accordance with Reservations' May 30 notice, the Muehlebach was placed "off-line" and was ineligible to receive reservations through Space Bank. In August, 1973, a reservations clerk at the hotel told Vincent that there had been some confusion about a guest who attempted to obtain a reservation through Space Bank and was told the Muehlebach was filled. The guest then called the hotel directly. Vincent did nothing about the incident. He couldn't imagine that Space Bank would try to turn

a person away from the hotel and concluded it was a misunderstanding.

Around the middle of September, the executive assistant in charge of reservations told Vincent that other reservations clerks had found a "very common problem" in this regard. She, Vincent and Hitz discussed the matter, talked to Muehlebach's attorney and decided to make some test calls to Reservations.

Between September 29 and October 22, seventeen calls were made to Space Bank by Muehlebach employees, requesting rooms there on nights when rooms were available. In seven instances, the operator responded that the Muehlebach was "sold out" on the night desired. In two instances, the response was that the Muehlebach was "booked." In six instances, the response was Muehlebach "not available." On the final call on October 22, the response was "Muehlebach not serviced by American Express." In one instance, the reservation was "confirmed."

On October 10, 1973, suit was filed by Muehlebach against American Express, charging that plaintiffs had been deprived of substantial business because defendants had misrepresented to plaintiffs' customers that plaintiffs could not accommodate such customers, when in fact it could have accommodated such customers. The petition stated that damages could not be determined until plaintiffs obtained the records from defendants of the number of such calls, but alleged that damages were at least $1,000.00. The petition also charged that the false advice to customers was deliberate, intentional and malicious and sought punitive damages of $2,500,000.00.

By an amended petition, Reservations was named a party defendant. The amended petition charged that Reservations had given false information to potential Muehlebach customers as "the result of an agreement between it and [American Express], both defendants having conspired together against plaintiff immediately after they were notified on January 30, 1973 that plaintiff was cancelling the agreements previously entered into by plaintiff * * ."

Again the petition prayed for $1,000 actual and $2,500,000 punitive damages. Both defendants filed what were essentially general denials and the case was tried on such pleadings.

A further understanding as to the basis of plaintiffs' claim as well as to the defense offered requires some detail as to the operation of the Space Bank Reservation Service.

The basic instrument of the system was a computer, located in Phoenix, Arizona, in which was stored data concerning all hotels and motels which belonged to the Space Bank system. Telephone calls from persons seeking reservations for accommodations were received by operators, employed by Reservations, located at Memphis, Tennessee. Each of some 200 to 250 operators had a telephone, a computer terminal and a manually operated "microfiche" viewer which displayed microfilmed information covering addresses, rates, types of rooms, etc., of member hotels. Upon receipt of a request for information or for a reservation, the operator would type the request, which would then appear on a cathode ray tube. The operator sends the message to the computer by depressing the "send" key. The computer responds and its response is displayed on the screen.

Operators were instructed to respond to callers in the language in which the reply appeared on the screen.

When the system was originally set up in 1968 it operated on what was known as a "single threading" computer program concept known as Space Bank System I. Under such program, only one message could be handled by the computer at a single time. In 1970, steps were begun to convert to a "multiple threading" system (SBS II), in which a large number of messages could be handled simultaneously by the computer. Design and implementation of the new program took some 2½ years. The new system was considerably more complicated than the old, evidenced by the fact that the program for SBS I required six volumes whereas that for SBS II required 15 to 18 volumes.

One response programmed into SBS I was "Location Not Open." This response indicated that the hotel was not "presently on the Space Bank System." By directive dated April 13, 1972, Harvey Dice, Director of Reservation Services, advised Reservation Managers: "When this response is received, please advise your Reservation Agents to advise guests that 'The Hotel is not being served by Space Bank at the present time.'

"Agents should not try to guess why the hotel is not being serviced by Space Bank, just state it isn't being serviced."

When SBS II went into operation in February, 1973, the "Location Not Open" response no longer appeared.

According to Robert Vanderven, an employee of American Express who directed the development and maintenance of computer "software," was in charge of the programming for SBS I, and who worked on SBS II, the response "Location Not Open" was not programmed into SBS II. The response "Not Available" was programmed into SBS I to be used whenever a hotel closed out to the system for any reason. The "Location Not Open" applied when the hotel had been "taken off-line." In the SBS II programming, the response "Not Available" was applied in both situations. According to Vanderven, there was no intentional change and if any came about it was "due to an oversight."

On November 16, 1973, following the filing of this action, Dice notified Reservation Managers that on November 24, a new computer response "Not available on system" would be "loaded on our system." One of the situations to which the response applied was when the hotel destination is "closed" because it has voluntarily removed itself from the system or because it had been removed involuntarily. Operators were directed that when such response appeared, they should inform the caller: "The hotel is not available on our system."

Miss Jane Carlson, who was employed by Reservations as an agent in February, 1972, became a lead agent in July, 1972, and an instructor in April, 1973, testified that res- ervation agents were instructed to give only the response which appeared on the tube. As lead agent, she monitored responses given by other agents and corrected them when they failed to follow instructions. When the response "Not available" appeared, the agent was directed to say, "I'm sorry that hotel is not available." The agent was directed to offer accommodations at other hotels in the vicinity. According to Miss Carlson, the response "Not available" * * * "meant that I couldn't sell a room." She conceded that a caller might take the response to mean that the hotel had no rooms to sell.

A printout of computer transactions relative to the Muehlebach revealed that between May 23 and October 21, 1973, the computer was accessed for availability checks 487 room nights and attempted sale on 336 room nights.

According to both Vanderven and Miss Carlson, the "not available" response was not applied exclusively to the Muehlebach but was applied equally to any hotel placed "off-line."

Plaintiffs' claim was submitted by the following verdict-directing instruction:

"Your verdict must be for plaintiffs and against both defendants if you believe:

" 'First, employees in charge of the computer installation of the Space Bank were employees of defendant, American Express Company, and

" 'Second, said computer installation in Phoenix, Arizona forwarded the "not available" response to defendant Reservations in Memphis, Tennessee, and

" 'Third, defendant Reservations gave prospective customers of Hotel Muehlebach said "not available" response on dates when rooms in said hotel were available, and

" 'Fourth, said response deprived plaintiffs of business from prospective customers, and

" 'Fifth, as a result of such response, plaintiffs were damaged.' "

In this court, appellants first complain that the theory of recovery pleaded by

plaintiffs was that of conspiracy and that there was no evidence of any agreement or conspiracy between appellants to injure respondents.

Respondents do not rely upon evidence of conspiracy but assert that they were entitled to ignore the conspiracy allegation and proceed against the appellants as joint tort feasors, relying upon such a rule stated in *Gruenewaelder v. Wintermann*, 360 S.W.2d 678, 688[3] (Mo.1962). As appellants' reply brief points out, Gruenewaelder did not involve a petition which alleged conspiracy (360 S.W.2d at 687[2]), so that the statement of the rule relied upon by respondents was purely dictum. Gruenewaelder quoted the rule relied upon from *Medich v. Stippec*, 335 Mo. 796, 73 S.W.2d 998, 1001[3, 4] (1934). In that case there was also evidence to support the conspiracy but the petition also charged wrongful acts to each of the defendants. In this case, the wrongful act charged was misrepresentation by Reservations as to availability of accommodations at the Muehlebach. The only wrong charged against American Express is by way of the conspiracy allegation.

In their brief, respondents assert that the appellants are jointly liable because American Express loaded the false "Not Available" response into the computer and Reservations is liable because it disseminated the false information. Thus, although the rule relied upon by respondents would permit proof of the charge against Reservations without regard to the conspiracy allegation, the same situation does not exist with respect to American Express. However, the only argument advanced here is in favor of a directed verdict as to both appellants. In such circumstances this court would treat the pleading as amended to conform with the proof and deny this allegation of error.

■ Appellants also argue that a verdict for defendants should have been directed because the evidence showed that the proximate cause of any loss to plaintiffs was their failure to pay their bill. Although the plaintiffs' default may have given rise to a right to cancel the Muehlebach's membership in the system, it did not give defend-ants a right to provide false information calculated to discourage future transactions between the hotel and its potential customers. That is the essence of the plaintiffs' complaint.

Appellants' second point is directed at the sufficiency of the plaintiffs' verdict-directing instruction, quoted above. Appellants contend that the instruction did not submit elements of an intentional tort and failed to submit essential elements for a claim of tortious interference.

The parties here have not undertaken to categorize the plaintiffs' claim. The respondents describe this action as one charging "a willful tort." However, their verdict-directing instruction makes no reference to any state of mind on the part of the defendants' officers or agents which might be characterized as "willful."

A distinguished writer has stated: "There is no necessity whatever that a tort must have a name." Prosser on Torts (4th ed.) § 1, p. 3 (1971). However, he has provided a fairly extensive categorization of the situations in which the law affords relief for injurious conduct. One of such categories is "Injurious Falsehood." Id., § 128, pp. 915--926. The Restatement recognizes such category of conduct as affording a basis for liability in tort. 3 Restatement of Torts, Second, Ch. 28, §§ 623A–652, pp. 332--403 (1977). The Restatement states the general principle of liability in this area as follows, Id., § 623A, p. 334:

"One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

"(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

"(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."

Prosser describes the wrong of "injurious falsehood" as consisting of "the publication of matter derogatory to the plaintiff's * *

business in general, * * * of a kind calculated to prevent others from dealing with him, * * *." Op. cit., § 128, pp. 919–920.

That this is the essential basis of plaintiffs' complaint is clear from the following allegation in their petition:

"By reason of defendant Reservations so misrepresenting to plaintiff's customers that plaintiff could not accommodate such customers, when in fact plaintiff could have accommodated such customers, plaintiff has been deprived of substantial business and has suffered substantial damage, * * *."

In this case, plaintiffs' submission was upon what was, in effect, a strict liability theory for publication of the false information. The Restatement originally adopted this theory of liability. Restatement of Torts § 625 (1938). However, the Restatement Second has rejected the strict liability in favor of the view expressed in § 623A, quoted above. Prosser likewise rejects the strict liability theory, Op. cit., § 128, pp. 921–922.

Restatement of Torts Second, § 651, pp. 371–372, states in part:

"§ 651. Burden of Proof

"(1) In an action for injurious falsehood the plaintiff has the burden of proving, when the issue is properly raised,

"(a) the existence and extent of the legally protected interest of the plaintiff affected by the falsehood;

"(b) the injurious character of the falsehood;

"(c) the falsity of the statement;

"(d) publication of the falsehood;

"(e) that the circumstances under which the publication was made were such as to make reliance on it by a third person reasonably foreseeable;

"(f) the recipient's understanding of the communication in its injurious sense;

"(g) the recipient's understanding of the communication as applicable to the plaintiff's interests;

"(h) the pecuniary loss resulting from the publication;

"(i) the defendant's knowledge of the falsity of the statement or his reckless disregard as to its truth or falsity; * * *."

§ 652 states in part (p. 375):

"§ 652. Function of Court and Jury

\* \* \* \* \* \*

"(2) Subject to the control of the court, when the issue arises, the jury determines whether,

"(a) the statement complained of was understood by the recipient as disparaging or otherwise injurious;

"(b) the statement was understood to be published of and concerning the plaintiff's interest;

"(c) the statement was false;

"(d) the circumstances were such as to make reliance on the publication by a third person reasonably foreseeable;

"(e) the publication caused pecuniary loss to the plaintiff, and if so, its extent;

"(f) the defendant had knowledge of the falsity of the statement or acted in reckless disregard of its truth or falsity; * * *."

■ Appellants' complaint that the verdict-directing instruction given in this case failed to require findings upon essential elements of the plaintiffs' case is valid. The tort of injurious falsehood involves, at least, legal malice. *Shapiro v. La Morta*, 40 The Times L.R. 201 (Ct.App.1923). As Prosser expresses it (op. cit. pp. 921–922):

" * * * There is liability when the defendant acts for a spite motive, and out of a desire to do harm for its own sake; and equally so when he acts for the purpose of doing harm to the interests of the plaintiff in a manner in which he is not privileged so to interfere. There is also liability when the defendant knows that what he says is false, regardless of whether he has an ill motive or intends to affect the plaintiff at all. The deliberate liar must take the risk that his statement will prove to be economically damaging to others; and there is something like the 'scienter' found in an action of deceit. Any of these three is

sufficient to constitute 'malice' and support the action. But in the absence of any of the three there is no liability, where the defendant has made his utterance in good faith, even though he may have been negligent in failing to ascertain the facts before he made it."

■ In this case, respondents produced no evidence of a spite motive, made clear by the abandonment of a conspiracy theory. They produced no evidence of purposeful harm to respondents by appellants. Therefore, the respondents were entitled to succeed in this case only if appellants knew that the "not available" response was false or if appellants acted in "reckless disregard" of the truth or falsity of the "not available" response.

■ Respondents' verdict-directing instruction failed to submit any such issue to the jury. The instruction assumes that the response was false. That was also a matter which the jury should have been called upon to decide.

Absent proof of responsibility of one defendant for acts of the other, any verdict-directing instruction must require a finding against each defendant of the requisite elements of the offense, if both are to be held liable.

For error in the verdict-directing instruction, the judgment must be reversed.

Appellants contend that their motion for judgment should have been sustained because plaintiffs failed to prove the fact and amount of damages.

Proof of pecuniary loss is an element of a claim for damages for injurious falsehood. Restatement, § 651(h), supra.

"(2) This pecuniary loss may be established by

"(a) proof of the conduct of specific persons, or

"(b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify." Restatement 2d, § 633, p. 355.

Comment (h) to this section states (p. 357):

"h. Widely disseminated injurious falsehood may, however, cause serious and genuine pecuniary loss by affecting the conduct of a number of persons whom the plaintiff is unable to identify and so depriving him of a market that he would otherwise have found. When this can be shown with reasonable certainty, the rule requiring the identification of specific purchasers is relaxed and recovery is permitted for the loss of the market. As in analogous cases involving the loss of profits of an established business, as the result of other torts or of breach of contract, this may be proved by circumstantial evidence showing that the loss has in fact occurred, and eliminating other causes."

In this case, Mr. Hitz testified to two theories of damage. One attributed the decrease of 12,830 room nights for the period in question below that for the comparable period for the preceding year and computed the loss of profits on that basis at some $200,000.00. Rather obviously, the jury rejected that theory. Evidence of damage on this theory is clearly too speculative to admit of a calculation on this ground. Upon proper objection, evidence in support of this theory should not be received on a new trial.

Hitz's second theory was based upon the assumption that the Muehlebach lost 823 room nights, the total nights shown by the computer printout for which reservations had been requested or inquiries made of Space Bank between June 1 and October 31, 1973. He computed a loss of profits for room rental of $16,297, being 90% of the anticipated room rental. He stated that because the hotel staff was already in place, no additional help would have been required, thus justifying his high rate of profit estimate. He also figured what the profit would have been on food and beverage sales to the lost customers, based upon the percentage which such sales bore to room rentals for the year 1973 and the rate of profit shown for such operations. These computations produced a loss of $8,039 profit on food sales and $3,039 on beverages.

This evidence sufficed to meet plaintiffs' burden in this case. The circumstances here were such as to permit a method of proof of lost profits analogous to that in breach of contract cases. Prosser, op. cit., § 128, p. 923. See *Plas-Chem Corporation v. Solmica, Inc.*, 434 S.W.2d 522, 526 (Mo. 1968).

Defendants did offer an alternative computation, based upon the assumption that the Muehlebach lost 653 room nights during the period it was "off-line." Defendants' computation of profit from such loss of room sales was $11,372.05. No computation was made of loss from food and beverage sales. Defendants also offered evidence concerning changes in the hotel situation in Kansas City which might have affected the Muehlebach operation during the period in question. However, the evidence was not of such a nature as to require a finding as a matter of law that plaintiffs had failed to relate their loss to the actions of defendants complained of.

Appellants contend that the damage instruction was erroneous because of the alteration of MAI 4.01 to permit recovery for damages "sustained as a direct result of the *occurrences* mentioned in the evidence." Appellants contend that the use of the plural rather than the singular "occurrence," as in MAI 4.01 resulted in error because there was evidence of loss of business by the Muehlebach for which the defendants could not have been liable. Specifically, appellants refer to the evidence of increased competition and other factors, alluded to above.

Appellants rely on the Notes on Use to MAI 4.01 which call for a "descriptive term" to be applied to the word "occurrence" when there is evidence that there were more than one occurrence resulting in damage but the defendants were responsible for only one. They state:

"A properly modified MAI 4.01 would have made it clear to the jury that plaintiffs could not be awarded damages for the Muehlebach's entire loss of business as contemplated by Plaintiffs' Exhibit 38."

As above noted, it is abundantly clear that the jury rejected the theory of damages based upon Exhibit 38, in which plaintiffs calculated their loss at in excess of $200,000.00. In this case, the failure to modify MAI 4.01 to direct the jury's attention to the "occurrence" for which the defendants might have been liable may have been at the most harmless error. *Crawford v. Smith*, 470 S.W.2d 529, 534 (Mo.banc 1971). However, upon a retrial the admonition of the Notes on Use to MAI 4.01 should be heeded.

Appellants attack the submission of the issue of punitive damages, both for lack of evidence to support the submission and for defects in the instruction submitting the issue.

The claimed lack of evidence is directed primarily to the absence of evidence of actual malice. However, the plaintiffs relied upon legal malice in their submission. Missouri, of course, recognizes legal malice as sufficient to support a claim for punitive damages. *Beggs v. Universal C. I. T. Credit Corporation*, 409 S.W.2d 719, 722–723[2–4] (Mo.1966). Appellants offer no authority supporting the disallowance of punitive damages on such basis in an action such as this. See *Foster v. Chicago, B. & Q. R. Co.*, 321 Mo. 1202, 14 S.W.2d 561, 572[7–9] (1928).

Appellants assert that the evidence showed at most only negligence on their part, insufficient to support a claim for punitive damages. That conclusion is premised primarily upon the defendants' evidence. The jury was not obliged to accept defendants' evidence and this court looks, on this argument, only at the evidence favorable to the jury's action.

The complaint against the form of the plaintiffs' instruction on this issue is meritorious. The instruction given was as follows:

"INSTRUCTION NO. 6

"If you find the issues in favor of plaintiffs, and if you believe that the conduct of the defendants as submitted in Instruction No. 3 showed complete indifference to or

conscious disregard for the consequences to others, you may assess punitive damages in addition to any damages assessed under Instruction No. 5.

"If punitive damages are assessed against more than one defendant, the amounts assessed against such defendants may be the same or they may be different. The amount of punitive damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct."

■ This is MAI 10.03 modified by substitution of "conduct of the defendants" for the language "conduct of one or more of the defendants" in the first paragraph. MAI 10.03 is designed for use when two or more defendants are involved. The defendants had the right to have their conduct considered separately for the purpose of determining whether or not punitive damages should be awarded. *Fordyce v. Montgomery*, 424 S.W.2d 746, 751[6–8] (Mo.App. 1968). The second paragraph of the instruction as given does accord defendants this right but the alteration of the first paragraph was unauthorized and is a deviation from MAI which is error.

Appellants also contend that the applicable MAI was 10.03, using the language "was willful, wanton or malicious" (MAI 10.01), accompanied by the definition of "malice" in MAI 16.01, rather than the language "showed complete indifference to or conscious disregard for the [consequences to] others" (MAI 10.02). Having concluded that the instruction given was erroneous, this claim of error need not be pursued. However, New Notes on Use to MAI 10.01 and MAI 10.02 (33 Jour.Mo.Bar, p. 453 (1977)), effective January 1, 1978, clearly infer that 10.01 and the alternative language thereof in 10.03 are to be used in cases of "intentional tort," with MAI 10.02 being the appropriate form for submission of punitive damages when the claim for actual damages is submitted on ordinary negligence. See *Sharp v. Robberson*, 495 S.W.2d 394 (Mo.banc 1973). That directive would, of course, be applicable upon a new trial of this cause.

■ Appellants finally contend that the trial court erred in admitting the taped recording of the calls made by Muehlebach personnel to Reservations, requesting reservations at the Muehlebach. When the matter of the tapes was presented prior to the opening statements, counsel for appellants objected to their use in evidence on two grounds: 1. Entrapment. 2. Invasion of privacy. That was stated as a continuing objection and no further objection was voiced when the tape was played to the jury. Appellants are limited to those grounds of objection so that there is no need to consider the claim now voiced of lack of adequate foundation to show that similar response was made when calls were made by others. Appellants have presented no authority in support of their entrapment objection. They admit that a party to a conversation is privileged to record it. *Smith v. Cincinnati Post & Times-Star*, 475 F.2d 740, 741 (6th Cir. 1973). As there stated: "Each party to a conversation, telephonic or otherwise, takes the risk that the other party may divulge the contents of that conversation, and should that happen, there has been no violation of the right of privacy." See *United States v. Phillips*, 540 F.2d 319, 327, fn. 5 (8th Cir. 1976). No error has been shown in this regard.

The judgment of the trial court is reversed and the cause is remanded for a new trial on all issues.

Reversed and remanded.

All concur.