

# In the Missouri Court of Appeals
# Eastern District
## DIVISION TWO

| | | |
|---|---|---|
| SEMO SERVICES, INC.,et al, | ) | No. ED110326 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | Cape Girardeau County |
| vs. | ) | Cause No. 19CG-CC00090 |
| | ) | |
| BNSF RAILWAY COMPANY, et al, | ) | |
| | ) | Honorable William E. Reeves |
| Respondent. | ) | |
| | ) | Filed: December 13, 2022 |
| | ) | |

## Introduction

SEMO Services, Inc. (SEMO) appeals from the trial court's judgment granting summary judgment in favor of BNSF Railway Company (BNSF) on SEMO's multiple count petition. In Point I, SEMO argues there is a genuine issue of material fact regarding whether BNSF's actions were justified and SEMO had an expectation of a continued business relationship with R.J. Corman Railroad Group, LLC (RJC) under the tortious interference claim, thus summary judgment was improper. In Point II, SEMO contends a genuine issue of material fact exists regarding whether BNSF published a letter and subsequent email containing a defamatory statement that BNSF was "in receipt" of SEMO's fraudulent invoice. In Point III, SEMO claims the trial court erred granting summary judgment in favor of BNSF on its affirmative defenses to

SEMO's defamation claim. In Point IV, SEMO argues summary judgment was improper because its claim for injurious falsehood exists independently of any underlying claim for defamation. Finally, in Point V, SEMO asserts a genuine issue of material fact exists as to whether BNSF acted willfully, wantonly or with a reckless disregard for the consequences when it made the defamatory statement against SEMO, and therefore, summary judgment on SEMO's claim for punitive damages was erroneous. We affirm.

## Background

On March 1, 2010, BNSF entered into a "Derailment and General Services Agreement" with RJC to provide "special equipment and specially trained personnel" for various railway services across a multi-state region, including derailment emergencies in return for compensation. Paragraph 17 specifically addresses the use of subcontractors, providing that any subcontractor "shall be deemed the agent of the Contractor (RJC)." Although BNSF maintained "overall management of the scene . . . the Railroad (BNSF) shall not directly supervise, instruct, divert, or utilize any personnel of Contractor or any of Contractor's subcontractors . . . ." In addition, their contract included a Targeted Annual Net Revenue (TANR) agreement where RJC guaranteed geographic coverage for BNSF. In exchange, RJC received a guaranteed sum including the "markup" cost that RJC charged BNSF for subcontractor work.

On February 9, 2015, SEMO entered into a "Comprehensive Master Agreement" with RJC for subcontractor services to supplement these responsibilities for BNSF and various RJC clients. Pursuant to the agreement, SEMO was to submit an itemized invoice to RJC after completing the work and following review of the invoice, RJC would forward the invoice to BNSF. Paragraph 10 states: "Notwithstanding any of the foregoing, Subcontractor shall

2

forthwith remove any of its employees from any RJC jobsite upon instructions by RJC or RJC's customer to do so."

On May 12, 2017, BNSF began an investigation after receiving an anonymous phone tip regarding potential fraud committed by SEMO, other contractors and even BNSF employees. Thereafter, BNSF sent a letter (August 17 letter) to SEMO notifying the company it was suspending business with the subcontractor while BNSF continued to investigate "the receipt of fraudulent invoices" and "possible kickbacks" by SEMO to BNSF employees. The August 17 letter is addressed to SEMO officials and is signed by Paul Bischler (Bischler), BNSF vice president of finance and chief sourcing and another BNSF official. The August 17 letter states:

> As you are aware, BNSF is investigating the receipt of fraudulent invoices as well as possible kickbacks by your company to BNSF employees.
>
> This letter is to inform you that BNSF is suspending any and all business activities with your company until the investigation is complete. We are also reviewing outstanding invoices due your company to ensure the accuracy of the invoices prior to making any further payments to your company. Your assistance in helping us with the investigation will be helpful to resolve this matter as soon as possible, including your assistance in the validation of the invoices.
>
> As set forth in the BNSF Supplier Guide, our business relationship requires adherence to the highest ethical, legal and procurement standards. Failure to cooperate fully with BNSF in this investigation will result in termination of that relationship. We reserve the right to take legal action should our investigation substantiate any fraudulent activities on the part of your company.
>
> If you have any information related to this investigation, please contact Angela Boogaerts, Program Manager, Anti-Fraud at 817-593-XXXX.

BNSF also shared the August 17 letter with RJC officials. Shortly thereafter, RJC instructed SEMO to close all work activities involving both BNSF and Union Pacific Railroad effective August 30. On September 29, BNSF informed RJC in writing that it should discontinue using SEMO for any projects involving BNSF but did not direct RJC to cease using SEMO exclusively.

3

On August 20, BNSF's director of line maintenance, Steve Heidzig, sent an email (August 20 email) to multiple BNSF field personnel, across multiple states, notifying them about the ongoing investigation and directing them to suspend any business activity with the four affected vendors, including SEMO. The email states:

> Heartland Engineering Officers,
>
> This is to inform you of an ongoing investigation into the receipt of fraudulent invoices as well as possible kickbacks to BNSF employees regarding the vendors outlined on the attached documents. All business activity has been suspended with the stated vendors pending completion of the investigation to also include possible legal action. Requesting that you each review the attached documents in detail and ensure that no field activity is attempted with these vendors. These business suspensions are effective immediately.
>
> One of our greatest strengths as a company is our collective commitment to ethics and legal compliance. As a reminder, if at any time you are confronted with a situation that is illegal, unethical or in conflict with our Code of Conduct please contact your direct supervisor, department head, HR or Compliance Officer. If concerns cannot be discussed with these individuals then contact the BNSF Hotline at 800-533-XXXX.
>
> BNSF is committed to providing a work environment that fosters mutual respect and working relationships free of retaliation, harassment, discrimination and unethical conduct. With those principles in mind, BNSF does not tolerate any form of retaliation, harassment, discrimination or unethical conduct by or toward employees, contractors, suppliers, or customers. This investigation should be considered confidential.
>
> It is my expectation that each of you will show your commitment to honest and ethical conduct in everything you do, including complying with federal, state and local laws and regulations. Together, we must continue to promote an environment where we can talk openly whenever we have doubts about the appropriate course of action or want to report a potential violation. By doing so, we can continue to demonstrate the highest ethical standards as a team and community.

The August 17 letter was attached to the email.

Following its investigation, BNSF did not discover any fraudulent invoices submitted by SEMO. However, between the May 12 anonymous phone call and the August 17 letter, Courtney

4

Estes (Estes), the BNSF official leading the investigation did identify some "red flags" and other "questionable" activity surrounding the procurement process. At the time BNSF suspended business relations with SEMO on August 17, Estes and her investigative team identified "inappropriate relationships" between BNSF employees and the vendor, concluded some employees were circumventing the proper work approval process preceding payment and determined SEMO was billing at an "excessive" rate.

SEMO filed the instant action against BNSF, alleging the August 17 letter and August 20 email misrepresented the factual circumstances by asserting SEMO submitted fraudulent invoices. As a result of the false allegations, SEMO alleged BNSF induced RJC to break its contract with SEMO and ruined the subcontractor's reputation within the railroad industry. On January 5, 2022, the trial court granted summary judgment in favor of BNSF and against SEMO on its claims against BNSF for libel/defamation, injurious falsehood, tortious interference, and punitive damages. SEMO now appeals.

## Discussion

### *Standard of Review*

Our court reviews the trial court's decision to grant summary judgment *de novo. Newton v. Mercy Clinic E. Communities*, 596 S.W.3d 625, 628 (Mo. banc 2020) (citing *ITT Comm. Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). When pursuing summary judgment, the moving party must both state the legal basis for the motion and demonstrate the lack of a genuine issue of material fact. Rule 74.04(c).[1] When responding, a party may not rely on a mere denial but, instead, must expose specific facts demonstrating that there is a "genuine issue for trial." *Id.* Deciding whether to grant summary judgment is an issue

---

[1] All rules referenced are to Missouri Supreme Court Rules (2022).

5

of law. *Ashford Condo., Inc. v. Horner & Shifrin, Inc.*, 328 S.W.3d 714, 717 (Mo. App. E.D. 2010). Specifically, an appellate court reviews the record in the light most favorable to the party against whom judgment was entered. *ITT Comm. Fin. Corp.*, 854 S.W.2d at 376. And the court will uphold summary judgment when the moving party establishes that there is not a genuine factual dispute and enjoys a right to judgment under the law. *Newton*, 596 S.W.3d at 628.

Where, as in this case, a defending party moves for summary judgment, the party will be entitled to judgment if they show: (1) facts negating any of the elements necessary to a plaintiff's claims; (2) that the plaintiff, after adequate discovery, has been and will not be able to produce evidence sufficient to allow a trier of fact to find the existence of any one of the required elements; or (3) there is no genuine dispute of facts required to prove properly pleaded affirmative defenses. *Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016), citing *ITT Comm. Fin. Corp.*, 854 S.W.2d at 381.

### Analysis

We consider SEMO's points on appeal in the following order: first we discuss Point II, which relates to count one of SEMO's fourth amended petition (petition) for libel/defamation. Next, we review Point I regarding summary judgment on SEMO's claim for tortious interference with a business expectancy, regarding count four of SEMO's petition. We analyze Point IV next, which concerns SEMO's claim for injurious falsehood in count two of SEMO's petition. Finally, we review Point V regarding summary judgment on SEMO's claim for punitive damages and relating to count six of its petition. We decline to address Point III regarding summary judgment on BNSF's affirmative defenses because our analysis of Point II is dispositive to the issue.

### Point II

6

In Point II, SEMO argues the trial court erred granting summary judgment in favor of BNSF on its claim for libel/defamation because a genuine issue of material fact exists regarding whether BNSF published the August 17 letter and August 20 email containing a defamatory statement that BNSF received SEMO's fraudulent invoice. We find SEMO's argument fails because the statement is not defamatory but instead the contents of the August 17 letter and August 20 email are "true or substantially true." *See Castle Rock Remodeling, LLC v. Better Bus. Bureau*, 354 S.W.3d 234, 241 (Mo. App. E.D. 2011); *Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 819 (Mo. App. W.D. 2012).

To prevail on a claim for defamation, SEMO must prove the following elements: 1) publication, 2) fault, 3) the statement is defamatory, 4) causation, and 5) damages. MAI 23.06(1). Initially, the court determines if the statement is defamatory. *Pape v. Reither*, 918 S.W.2d 376, 380 (Mo. App. E.D. 1996); *Barge v. Ransom*, 30 S.W.3d 889, 890 (Mo. App. S.D. 2000). A statement is defamatory if it clearly targets a specific individual and derides that person's reputation so as "to lower him in the estimation of the community or to deter third persons from associating with him." *Pape,* 918 S.W.2d at 380 (citing *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. banc 1985) (quoting Restatement (Second) of Torts, § 559 (1977)).

Statements falsely attributing conduct incompatible with the complaining party's business are defamatory per se. *Pape,* 918 S.W.2d at 380 (citing *Matyska v. Stewart*, 801 S.W.2d 697, 700 (Mo. App. E.D. 1991)). The statement's falsity is a critical element within the defamation cause of action. *See Castle Rock Remodeling, LLC*, 354 S.W.3d at 240 ("Because falsity is an element of a defamation claim, Castle Rock cannot maintain a cause of action based on this factual statement"). When determining the accuracy or falsity of a statement, "the court must examine the totality of the circumstances." *Id.* at 241. In other words, the courts do not

7

evaluate the language in isolation but consider the full context of the statement and recognizing the totality of the circumstances is essential to this review. *Henry*, 690 S.W.2d at 788; *Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 311 (Mo. banc 1993).

The basis of SEMO's claim for libel/defamation centers upon statements BNSF made in the August 17 letter and August 20 email. As previously discussed, the August 17 letter informs SEMO that BNSF is "investigating the receipt of fraudulent invoices as well as possible kickbacks by your company to BNSF employees."[2] SEMO specifically points to four words contained in the August 17 letter, "receipt of fraudulent invoices," in the opening sentence of the four-paragraph, approximately 175-word letter. SEMO argues this statement is factually inaccurate and defamatory because BNSF is unable to identify a single fraudulent invoice submitted by SEMO at the time of the August 17 letter or even to date. However, this argument ignores the full context of the August 17 letter.

In the first paragraph's only sentence, BNSF notifies SEMO it is investigating potentially fraudulent practices. SEMO argues one isolated portion of this sentence implies the alleged fraudulent activity was confirmed; however, the rest of the sentence and letter clearly state the fraud is merely "possible." In the August 17 letter BNSF explains the investigative steps it plans to take, the company's course of action given the allegation of fraud, the possible consequences if fraudulent conduct is discovered and requests SEMO's cooperation. The second paragraph includes language in two different locations indicating the investigation is ongoing and has not been concluded. BNSF specifies its intent to review "outstanding invoices . . . to ensure the accuracy" and requests assistance "validati(ng) . . . the invoices." In the third paragraph, BNSF

---

[2] SEMO disputes that it forwarded invoices to BNSF directly. Pursuant to their contractual agreement and agreed upon procurement procedure, SEMO submitted each line-itemed invoice to RJC. After review, RJC submitted the invoice to BNSF.

further confirms the allegations are uncorroborated at the time of the August 17 letter by detailing potential legal action that will follow the discovery of "any" fraudulent activities. Significantly, the third paragraph does not refer to "further" or "additional" fraudulent activities, communicating the instant allegations have not been substantiated.

When viewed in its entirety, the August 20 email does not contain a false statement sufficient to satisfy the element required for SEMO's defamation claim. The email is addressed to multiple BNSF field employees, notifying them to immediately cease business with the targeted vendors, not just SEMO, pending an investigation. Attached to the email is the previously discussed August 17 letter. The email begins with nearly identical language as contained within the letter, explaining "(t)his is to inform you of an ongoing investigation into the receipt of fraudulent invoices as well as possible kickbacks to BNSF employees regarding the vendors outlined on the attached documents."

The August 20 email references "the receipt of fraudulent invoices," allowing SEMO to argue again that BNSF is attributing fraudulent invoices to SEMO. However, the August 20 email describes the "ongoing investigation" and "pending completion of the investigation" in its opening paragraph, again communicating any allegation of fraud is unsubstantiated or undetermined at this point in time.

When viewed in their entirety, in full context, and based on "the totality of the circumstances," we find no genuine dispute of material fact exists that the contents of both the August 17 letter and the August 20 email were true, or substantially true, contained mostly accurate representations and did not falsely attribute conduct to SEMO. *Castle Rock Remodeling, LLC*, 354 S.W.3d at 241; *Henry*, 690 S.W.2d at 788-89; *Nigro*, 371 S.W.3d at 819; *Pape*, 918 S.W.2d at 380. Under the law, the statement must be false to prevail on a misrepresentation

9

claim. *Gurley v. Montgomery First Nat'l Bank, N.A.*, 160 S.W.3d 863, 867 (Mo. App. S.D. 2005). Thus, summary judgment in favor of BNSF on SEMO's claim for libel/defamation was proper. Point II fails.[3]

**Point I**

In Point I on appeal, SEMO argues the trial court erred in granting summary judgment in favor of BNSF on SEMO's claim for tortious interference because a genuine issue of material fact exists regarding whether BNSF's actions were justified, used improper means and whether SEMO had an expectation of a continued business relationship with RJC. SEMO's claims are without merit.

To prevail in a tortious interference with business expectancy cause of action, the Plaintiff has the burden of proving the following elements: 1) an existing contract or a valid business expectancy; 2) defendant knew of the contract or business expectancy; 3) defendant intentionally interfered with the relationship or expectancy by creating a breach; 4) defendant lacked justification and 5) the conduct damaged Plaintiff. *All Star Awards & Ad Specialties, Inc. v. Halo Branded Solutions, Inc.*, 642 S.W.3d 281, 293 n.15 (Mo. banc 2022) (citing *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990)); *O'Conner v. Shelman*, 769 S.W.2d 458, 461 (Mo. App. W.D. 1989). A tortious interference claim does not require a finding that the defendant induced the breach by fraud, deceit or coercion. *All Star Awards*, 642 S.W.3d at 291. The absence of justification is an essential element within the tortious interference claim. *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones &*

---

[3] SEMO makes additional claims about possible "spoliation" by BNSF's alleged failure to identify the complete list of the email recipients. Our court does not take this allegation lightly since "[t]he law, in hatred of the spoliator, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrong-doer by the very means he had so confidently employed to perpetrate the wrongdoing." *Marmaduke v. CBL & Associates Mgmt., Inc.*, 521 S.W.3d 257, 268 (Mo. App. E.D. 2017) (quoting *Pomeroy v. Benton*, 77 Mo. 64, 86 (1882)). We do not address this issue only because we find that the statement is not defamatory.

10

*Co.*, 586 S.W.2d 310, 315 (Mo. banc 1979); *Pillow v. Gen. American Life Ins. Co.*, 564 S.W.2d 276, 280 (Mo. App. 1978); *Hanrahan v. Nashua Corp.*, 752 S.W.2d 878, 882 (Mo. App. E.D. 1988).

### *Absence of Justification*

SEMO accepts the burden to establish BNSF's conduct when communicating with RJC was without justification. A defendant's conduct is without justification when the defendant uses "improper means" to further his interests and to the plaintiff's detriment. *Nazeri*, 860 S.W.2d at 317. In fact, "only a showing of improper means satisfies the burden of establishing a lack of justification in a tortious interference with expectancies case." *Clinch v. Heartland Health*, 187 S.W.3d 10, 17 (Mo. App. W.D. 2006) (citing *Cmty. Title Co.*, 796 S.W.2d at 372). Thus, the issue is whether BNSF interfered with SEMO's business relationship with RJC by using improper means to advance its own interests at SEMO's expense. We find the undisputed facts show it did not.

SEMO claims that BNSF's allegation about SEMO's fraudulent billing was a pretext to interfere with the subcontractor's business relationship with RJC. In fact, SEMO contends BNSF lacked any evidence of fraudulent invoices when it chose to publish the August 17 letter because the railroad did not request SEMO's supporting documents until later on August 25. According to SEMO, our inquiry is limited to only what BNSF knew at the time of the August 17 letter and not what, if anything, was revealed later in the investigation. We agree what BNSF knew regarding concerns of fraudulent activity at the time of the August 17 letter is most relevant to our analysis here. *McDowell v. Credit Bureaus*, 747 S.W.2d 630, 632 (Mo. banc 1988) (If the qualified privilege applies, the Plaintiff must prove that the statement was made "with the

11

knowledge that it was false, or with reckless disregard for whether it was true or false at a time when defendant had serious doubts as to whether it was true." quoting MAI 23.06(2).)

On May 12, 2017, BNSF received the anonymous call which was reasonably specific, accusing SEMO of providing kickbacks to three different named BNSF employees. Further, the caller identified two additional companies participating in the fraudulent invoice scheme besides SEMO. Within days, BNSF initiated an inquiry utilizing a team of investigators.

As previously noted, Estes, charged with leading BNSF's investigation into fraudulent activity, identified "red flags" and other "questionable" activity, including "inappropriate relationships" between SEMO and BNSF employees circumventing the procurement process. In his deposition, Bischler explained that before he signed and forwarded the August 17 letter, the incipient stages of the BNSF investigation or audit uncovered multiple concerns, such as the fact the business process outlining SEMO's work procedure was not being followed, SEMO's work performance on one project fell outside of the scope of the contract and SEMO's spending was elevated. Another BNSF investigator, Angela Boogaerts (Boogaerts) identified a conflict of interest existing between a BNSF employee and a SEMO executive after discovering a text message promising work to SEMO outside the normal procurement process by utilizing a grappling truck. In addition, BNSF knew that the grappling truck had been used many days and the charging was questionable. Of additional concern, BNSF learned that another vendor was in fact owned by the family of one of the BNSF employees accused of wrongdoing in the telephone call. SEMO was utilizing this company on their work projects. Additionally, Boogaerts and BNSF discovered another vendor implicated in the telephone call was seeking payment for the questionable rental of "Porta Johns." Relatedly, BNSF had received duplicate invoices from this same vendor requesting payment for SEMO work.

12

By August 17, BNSF had discovered justifiable, specific concerns about their business relationship with SEMO following the initial stages of the investigation. These troubling irregularities involving procurement and billing for non-emergency work that occurred outside the scope of contractual specifications threatened BNSF's fiscal health. Considering this, the undisputed facts show BNSF was not acting without justification when suspending business relations with SEMO, withholding payment pending the investigation, asking RJC to likewise audit and review records for fiscal irregularities, as well as directing BNSF employees to cease business activities with SEMO, thus negating the necessary element of SEMO's claim for tortious interference. *See Fischer,* 586 S.W.2d at 315; *Pillow,* 564 S.W.2d at 280; *Hanrahan,* 752 S.W.2d at 882.

### Improper Means

In its petition, SEMO alleges BNSF used improper means such as defamation, reckless misrepresentation of fact,[4] and economic coercion when intentionally interfering with SEMO's business relationship with RJC. More specifically, SEMO asserts BNSF withheld payments for work completed by SEMO pending an investigation based solely on an anonymous call; BNSF requested that RJC conduct additional audits of SEMO; BNSF shared the contents of the August 17 letter with RJC and BNSF even demanded that RJC sever its relationship with SEMO by breaching their contract. SEMO further alleges that based on their collective, high pressure tactics, BNSF effectively persuaded RJC to sever all business relations with SEMO, not just for their BNSF work projects. Although the investigation failed to uncover any evidence of

---

[4] Based on the totality of the contents and circumstances surrounding the August 17 letter and August 20 email, we find that BNSF did not use defamatory language or engage in any misrepresentation, as previously discussed in Point I.

fraudulent invoices, SEMO further contends that BNSF's reckless conduct caused far reaching consequences, devasted their reputation and badly damaged SEMO to the point of financial ruin.

When alleging economic coercion, SEMO points to the BNSF emails, one occurring within days of the anonymous call, where BNSF directs RJC to refrain from using subcontractors and implicitly criticizes RJC for the exorbitant subcontractor billing costs. SEMO points to this as further evidence of BNSF pressuring RJC to discontinue using subcontractors like SEMO. As the emails confirm, BNSF was displeased that RJC was delegating considerable work to subcontractors when BNSF believed RJC should be performing this work. Further, this was driving up costs for BNSF. Arguably, BNSF had a right to protect its business interests and, equally, had an economic interest in the RJC/SEMO arrangement because BNSF was ultimately paying for the work on its property. Thus, BNSF's actions do not constitute improper means because BNSF has a right to interfere with another's "business expectancy to protect [its] own economic interests." *Cmty. Title Co*, 796 S.W.2d at 372. When maintaining an economic interest such as a contract or any financial concern, a defendant is privileged to interfere with another's business expectancy to protect that economic interest. *Id.*

SEMO further argues that BNSF's desire to limit subcontractor costs steered their decision to target SEMO in the investigation. While BNSF was undoubtedly concerned about the excessive costs associated with subcontractors, nothing in the summary judgment record demonstrates BNSF targeted SEMO specifically. BNSF investigated SEMO along with the other vendors implicated in the telephone call as well as RJC. For similar reasons, BNSF suspended their relationship with three additional vendors, not just SEMO. Moreover, the record reveals that BNSF also investigated its own employees accused of conspiring to defraud the company,

14

ultimately influencing their conclusion about conflict of interest relationships. Failure to follow-up would have been financial folly.

SEMO also argues that *Clinch v. Heartland Health* offers worthwhile guidance when identifying improper means. 187 S.W.3d 10 (Mo. App. W.D. 2006). In *Clinch*, the Western District reversed the trial court's grant of summary judgment in favor of the defendant, Nellestein, because there was a genuine issue of whether the defendant used improper means through defamation and misrepresentation to interfere with Clinch's contractual relationship with the hospital, Heartland Health. *Id.* at 18-19. The hospital terminated Clinch's contract after a fellow surgeon, Nellestein, accused Clinch of having a 35 percent complication rate with his surgeries and suggested the hospital investigate. *Id.* at 13, 18. The court held that a jury could infer that Nellestein defamed Clinch and misled hospital officials without explaining that he had neither isolated the causes nor conducted a more complete analysis of the 35 percent complication rate as well as suggesting they investigate. *Id.* at 18-19. Ultimately, the hospital reviewing authority did not find any problems with "Clinch's morbidity, mortality or infection rates." *Id.* at 13.

*Clinch* is distinguishable from our matter. In *Clinch*, Nellestein was the sole actor who focused exclusively on Clinch. He initiated the complaints against Clinch, using what could be interpreted as incomplete information, and continued to fan the flames of discontent by calling on the hospital to investigate. Unlike those factual circumstances, here, the initial complaining party sounding the alarm is the outside, anonymous caller, not BNSF. Further, the caller did not just accuse SEMO of improprieties but rather named multiple offenders, including BNSF's own employees. Unlike *Clinch* where the hospital investigation did not discover any problems with a range of issues relating to Clinch's medical rates, BNSF's investigation did uncover some

15

specific concerns involving SEMO that affected BNSF's financial interests. Thus, we do not find *Clinch* applicable or persuasive here.

*Lack of a Business Expectancy*

SEMO's claim for tortious interference with a business expectancy also fails because SEMO could not reasonably anticipate continued business with RJC on BNSF projects. BNSF admits in its 'Statement of Material Facts,' that it "has no right to direct or control RJC employees . . . and has no right to select, hire, train or fire RJC's employees." BNSF further admits that any of RJC's subcontractors "shall be deemed the agent of Contractor, and Contractor shall be responsible for Work of subcontractors to the same extent as if Contractor had provided services itself." In addition, the contractual agreement between BNSF and RJC provides that BNSF agrees that it shall "not directly supervise, instruct, divert, or utilize any personnel of Contractor or any of Contractor's subcontractors . . . ."

While this standard contractual language appears to allow RJC and its subcontractors to perform work obligations within the scope of the contract while free of any intrusion by BNSF, BNSF is not unconditionally prohibited from interfering in the SEMO/BNSF work relationship, as SEMO suggests. More specifically, as previously noted, the last sentence in Paragraph 10 of the agreement between RJC and SEMO mandates: "Notwithstanding any of the foregoing, Subcontractor shall forthwith remove any of its employees from any RJC jobsite upon instructions by RJC or RJC's customer (BNSF) to do so." This provision effectively nullifies any "valid business expectancy." *Rhodes Eng'g Co., Inc. v. Pub. Water Supply Dist. No. 1 of Holt Co.*, 128 S.W.3d 550, 566 (Mo. App. W.D. 2004).

Relatedly, in *Stehno v. Sprint Spectrum, L.P.*, the Supreme Court of Missouri held that the plaintiff did not enjoy a valid business expectancy where the agreement between his

16

employer and its client allowed the client to terminate a service for any reason with seven days' notice and also allowed the client to remove the subcontractor's personnel. 186 S.W.3d 247, 251-52 (Mo. banc. 2006). Stehno was a temporary contractor who worked for Modis Inc., an information technology consulting company. *Id.* at 249. Modis contracted with Amdocs to supply temporary consultants, including Stehno. *Id.* Subsequently, Amdocs contracted with Sprint and assigned Stehno to assist with their billing system. *Id.* at 250. Later, Sprint expressed dissatisfaction about Stehno to Amdocs who terminated Stehno from the Sprint assignment. *Id.* Subsequently, Modis fired Stehno who sued Sprint and Amdocs for tortious interference. *Id.* The Supreme Court held that Stehno did not enjoy a business expectancy in this situation because the contractual provisions allow (the client and subclient) to remove him from the project which was a temporary assignment. *Id.* at 252.[5]

Here, similar to the underlying facts in *Stenho*, BNSF's actions are protected by contractual language. The comprehensive master agreement between RJC and SEMO allows RJC or its customer to restrict access to BNSF property. More specifically, SEMO agreed it would remove any of its employees from any jobsite if so instructed. This contractual language empowers both RJC and BNSF to remove SEMO from the BNSF jobsite without condition, and defeats the element of the existence of a business expectancy in continued work with RJC.

As a result of the foregoing, the undisputed facts show that BNSF's conduct was not unjustified and it did not use improper means when interfering with the SEMO/RJC relationship. Further, SEMO did not enjoy a valid business expectancy with RJC on BNSF projects due to the

---

[5] SEMO argues the Western District's decision in *Henson v. Truman Med. Ctr.*, 62 S.W.3d 549, 533 (Mo. App. W.D 2001) is more relevant to the issue of business expectancy here. However, the Supreme Court distinguished *Henson* in *Stehno*, and we agree it is distinguishable from the present case as well.

17

contractual constraints in their agreements. Therefore, summary judgment in favor of BNSF on SEMO's claim for tortious interference was proper. Point I is denied.

**Point IV**

In Point IV on appeal, SEMO argues the trial court erred in granting summary judgment in favor of BNSF on SEMO's claim for injurious falsehood because the claim exists independently of any underlying claim for defamation.

The trial court specifically found summary judgment in favor of BNSF was proper on the claim for injurious falsehood because "for a statement to be actionable as injurious falsehood it must be defamatory." *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580 (8th Cir. 2016); *see also State Ex Rel. Diehl v. Kintz*, 162 S.W.3d 152, 156, n.4 (Mo. App. E.D. 2005). Thus, because the trial court found the defamation claim was not actionable, it held the injurious falsehood claim likewise failed according to the law.

Conversely, SEMO asserts that the law recognizes injurious falsehood as a separate cause of action which exists independently of a defamation claim. *State ex rel. BP Prod. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 927 (Mo. banc 2005). We note the "[d]efamation analysis applies to ... injurious falsehood." *Kintz*, 162 S.W.3d at 156, n.4 (citing *Kennedy v. Microsurgery and Brain Research Institute*, 18 S.W.3d 39, 43-44 (Mo. App. E. D. 2000)). Further, dismissal is the proper remedy when the alleged defamatory statement is the basis of the claim but it is not actionable. *Others First, Inc.*, 829 F.3d at 580.

However, SEMO points to the holding in *Annbar Associates v. American Express Co*, 565 S.W.2d 701 (Mo. App. 1978), where the court adopted Restatement (Second) of Torts § 623A (1977) when recognizing injurious falsehood as a separate tort. *Id.* More specifically, the elements for this tort require that first, the intentional publication of the statement harm the

18

pecuniary value and second, the tortfeasor knows that the statement is false or acts in reckless disregard of the truth or falsity. Restatement (Second) of Torts, § 623A (1977).

This alternative to the statement's falsity in the second element of the Restatement (Second) of Torts § 623A (1977), reads the tortfeasor "knows that the statement is false or acts in reckless disregard of its truth or falsity." Restatement (Second) of Torts, § 623A (1977). As discussed in our analysis of Point I, BNSF's actions were not reckless when distributing the August 20 email with the August 17 letter attached. In an effort to ensure that BNSF was not conducting business with SEMO and the additional few contractors under investigation, BNSF distributed this communication to the field employees to protect its interests and ensure business with SEMO had ceased.

Additionally, we do not find BNSF acted with reckless disregard when sharing the August 17 letter with RJC executives because RJC was in a contractual relationship with both parties and had an interest in knowing about the investigation. *Gray v. AT&T Corp.*, 357 F.3d 763, 765-67 (8th Cir. 2004) (holding that the defendant, AT&T, did not publish allegedly defamatory statement to a third party, Gates McDonald, which had a contractual relationship with AT&T to process unemployment claims). Further, RJC was responsible for SEMO while working on BNSF property pursuant to the agreement between RJC and BNSF, which states RJC "shall be responsible for the (w)ork of subcontractors to the same extent as if Contractor had provided the services itself."

The undisputed facts in the summary judgment record show BNSF did not act recklessly in sharing the information in its August 17 letter, and therefore summary judgment in favor of BNSF on SEMO's claim for injurious falsehood was proper. Point IV is denied.

**Point V**

19

In Point V, SEMO argues the trial court erred when granting summary judgment in favor of BNSF on SEMO's claim for punitive damages. A claim for punitive damages is not an independent cause of action but is inextricably linked to the underlying cause of action. *Harris v. Jungerman*, 560 S.W.3d 549, 555 (Mo. App. W.D. 2018). A plaintiff must prevail on the underlying claim to submit punitive damages. *Romeo v. Jones*, 144 S.W.3d 324, 334 (Mo. App. E.D. 2004). Since we affirm the trial court's grant of summary judgment in favor of BNSF on each of SEMO's underlying causes of action, the claim for punitive damages also fails. Point V is denied.

## Conclusion

The undisputed facts in the summary judgment record show BNSF was entitled to judgment as a matter of law on SEMO's claims for libel/defamation, injurious falsehood, tortious interference and punitive damages. We affirm the judgment of the trial court.[6]

Thomas C. Clark II, J.

Lisa P. Page, P. J., and
Kurt S. Odenwald, J., concur.

---

[6] BNSF filed a motion to dismiss the appeal on the basis that the issues are barred by collateral estoppel as well as a motion to dismiss or in the alternative to strike SEMO's Appellant's brief for failure to comply with Rule 84.04. Both motions were taken with the case and are denied.